Dwight J. LOVING, Private
U.S. Army, Petitioner

v.

UNITED STATES, Respondent

No. 06-8006

Crim. App. No. 8901123

United States Court of Appeals for the Armed Forces

Argued May 16, 2006

Decided September 29, 2006

GIERKE, C.J., delivered the opinion of the Court, in which BAKER
and ERDMANN, JJ., joined.  EFFRON, J., filed a separate opinion
concurring in part and in the result.  CRAWFORD, J., filed a
dissenting opinion.


Counsel

For Petitioner:  Teresa L. Norris, Esq. (argued); John H. Blume,
Esq., Kirsten A. Salcow, Esq., Lieutenant Colonel Kirsten V. C.
Brunson, and Captain Julie A. Caruso (on brief).

For Respondent:  Captain Magdalena A. Acevedo (argued);
Lieutenant Colonel Mary M. Foreman, Major William J. Nelson (on
brief); Lieutenant Colonel Theresa A. Gallagher.


**This opinion is subject to revision before final publication**.

Chief Judge GIERKE delivered the opinion of the Court.

### I. INTRODUCTION

Senior Judge Robinson O. Everett, writing for this Court, once quoted the fundamental legal maxim, "'Always salt down the facts first; the law will keep.'"[1] He reaffirmed this point with this intuitive observation, "'In the very nature of things, it is impossible for a court to enter a valid judgment declaring the rights of parties to litigation until the facts on which those rights depend have been 'salted down' in a manner sanctioned by law.'"[2] Although we address several issues here, the pivotal issue is whether this Court has an adequate factual record to determine if trial defense counsel performed a reasonable investigation to establish the necessary factual predicate for later tactical decisions in this capital case.

After our completion of direct review in this case,[3] the Supreme Court decided Wiggins v. Smith.[4] The Supreme Court in Wiggins applied the "clearly established" precedent of Strickland v. Washington,[5] that governs claims of ineffective assistance of counsel.[6] In so doing, the Supreme Court found

---

[1] United States v. Haney, 45 M.J. 447, 448 (C.A.A.F. 1996) (quoting Erickson v. Starling, 71 S.E.2d 384, 395-96 (N.C. 1952)).
[2] Id. at 448 (quoting Erickson, 71 S.E.2d at 396).
[3] United States v. Loving, 41 M.J. 213 (C.A.A.F. 1994).
[4] 539 U.S. 510 (2003).
[5] 466 U.S. 668 (1984).
[6] Wiggins, 539 U.S. at 522.

ineffective representation by a defense counsel in a capital case who failed to pursue leads and to expand the mitigation investigation into the defendant's traumatic life history.[7] In Wiggins, the Supreme Court reaffirmed that defense counsel has a fundamental duty to perform a reasonable investigation.[8]

In a petition for extraordinary relief in the nature of a writ of habeas corpus, Petitioner asserts that the trial defense counsel who defended him in his capital case were similarly deficient in not reasonably investigating his traumatic life history. Therefore, Petitioner also asserts that his case is controlled by the precedent of Strickland as illustrated by the Wiggins case.

To support his claim, Petitioner has filed voluminous documents and affidavits. But all the facts relevant to this issue are not apparent on the face of the record. In light of the more recent Supreme Court decision in Wiggins, we conclude that we do not have the factual predicate to determine if our prior decision addressing the issue of ineffective assistance of counsel was correct under the Strickland standard that constituted clearly established law at the time of our initial direct review of this case.

---

[7] Id. at 523-38.
[8] Id. at 521 ("'[C]ounsel has a duty to make reasonable investigations'" (quoting Strickland, 466 U.S. at 691)).

Given this conclusion, we will afford the parties the opportunity to have the facts "'salted down' in a manner sanctioned by law."[9]  Therefore, we order a DuBay[10] evidentiary hearing to address the issue of whether Petitioner's trial defense counsel "chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible"[11] thereby prejudicing Petitioner in the capital sentencing phase of the court-martial.

## II.  APPELLATE HISTORY AND BACKGROUND OF PETITION FOR EXTRAORDINARY RELIEF IN THE NATURE OF A WRIT OF HABEAS CORPUS

This is a capital case that this Court affirmed on direct appeal.[12]  Later, the Supreme Court granted certiorari and affirmed this Court's decision.[13]  The case has been forwarded to the President for action under Article 71(a), Uniform Code of Military Justice (UCMJ),[14] but he has not yet acted.

The detailed appellate history of this case is documented in two prior opinions of this Court.[15]  Most recently, on

---

[9] Haney, 45 M.J. at 448 (quoting Erickson, 71 S.E.2d at 396) (quotation marks omitted).
[10] United States v. DuBay, 17 C.M.A. 147, 37 C.M.R. 411 (1967); see United States v. Flint, 1 M.J. 428, 429 (C.M.A. 1976) ("A DuBay proceeding, in effect, is utilized to gather additional evidence or to resolve conflicting evidence before determining an issue presented to the appellate tribunal.").
[11] Wiggins, 539 U.S. at 527-28.
[12] Loving, 41 M.J. at 300.
[13] Loving v. United States, 517 U.S. 748, 774 (1996).
[14] 10 U.S.C. § 871(a) (2000).
[15] Loving v. United States, 62 M.J. 235, 238 (C.A.A.F. 2005); Loving v. Hart, 47 M.J. 438, 440 (C.A.A.F. 1998), cert. denied, 525 U.S. 1040 (1998).

December 20, 2005, we dismissed without prejudice Petitioner's two petitions seeking a writ of error coram nobis.[16] We also expressly stated that Petitioner could "refile a writ of habeas corpus with this Court."[17]

Availing himself of this opportunity, Petitioner filed a petition for extraordinary relief in the nature of a writ of habeas corpus with this Court on February 2, 2006. This Court issued a show cause order, and the Government responded on April 14, 2006. Petitioner filed a reply brief on April 28, 2006. This Court heard oral argument on this writ on May 16, 2006.

In the present pleading, Petitioner combines the substance of his two prior petitions seeking a writ of error coram nobis. He requests that this Court apply to his military justice capital case the authority of three recent Supreme Court cases -- Apprendi v. New Jersey,[18] Ring v. Arizona,[19] and Wiggins.[20]

---

[16] Loving, 62 M.J. at 236.
[17] Id.
[18] 530 U.S. 466 (2000). In Apprendi, the Supreme Court interpreted the constitutional due process and jury trial guarantees to require that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490.
[19] 536 U.S. 584 (2002). Applying Apprendi to the Arizona capital sentencing proceedings that required the finding of an aggravating factor, Ring required that a jury, rather than a judge, find the existence of the aggravating factor. Id.
[20] 539 U.S. 510.

These cases and this Court's consideration of Petitioner's habeas corpus petition raise threshold legal issues, as well as issues on the merits. The threshold issues relate to this Court's jurisdiction to consider this petition, the appropriateness of the writ of habeas corpus at this Court, and the applicability -- including the retroactive application -- of this recent legal precedent to the present proceedings.

In our most recent opinion in this case,[21] we resolved the first two issues. We held that this Court has collateral review jurisdiction over this case during "the period after 'there is a final judgment as to the legality of the proceedings' under Article 71(c)(1) [UCMJ], but before the case is 'final' under Article 76 [UCMJ]."[22] The procedural posture of this case has not changed since our most recent opinion; therefore, this Court still has collateral review jurisdiction over this case.

Moreover, as this Court's statutory subject matter jurisdiction over this case is established, we may invoke the All Writs Act[23] to address the substantive issues here.[24] Again, in our most recent opinion in this case, we also held that

---

[21] Loving, 62 M.J. at 236 (footnotes omitted).
[22] Id.
[23] 28 U.S.C. § 1651(a) (2000). The All Writs Act authorizes "all courts established by Act of Congress [to] issue all writs necessary or appropriate in aid of their respective jurisdictions." Id. "The Supreme Court has recognized this Court's power to issue extraordinary writs under the All Writs Act." Loving, 62 M.J. at 246 (citing Clinton v. Goldsmith, 526 U.S. 529, 534 (1999)).
[24] Loving, 62 M.J. at 255-57.

Petitioner can seek a writ of habeas corpus under the All Writs Act at this Court.[25]

We must resolve one additional threshold issue:  In light of the unique procedural posture of this case, can Petitioner avail himself of any of the legal holdings in Ring, Apprendi, and Wiggins to support his claims?

The issues relating to the merits of this habeas petition question the authority of the President to promulgate aggravating factors, the reliability of the capital sentencing weighing process, and the effectiveness of counsel in making decisions relating to investigating the background of Petitioner.

### III.  DISCUSSION OF THE FINAL THRESHOLD ISSUE -- DO THE HOLDINGS OF RING, APPRENDI, AND WIGGINS APPLY TO PETITIONER'S CASE ON COLLATERAL REVIEW?

In Griffith v. Kentucky,[26] the Supreme Court established the legal principle that its decision that announces a "new rule" applies to all criminal cases still pending on direct review.[27] But when a case is final, there is an issue as to the retroactive application of the new rule.

---

[25] Id. at 255-56.
[26] 479 U.S. 314 (1987).
[27] Id. at 328.

In Teague v. Lane,[28] the Supreme Court clarified and modified previous decisions regarding retroactivity of new constitutional rules.  The Court held that new constitutional rules should not be applied retroactively to convictions on collateral review that have become final, unless a new rule falls into one of two exceptions:  (1) the new substantive rule places "'certain kinds of . . . individual conduct beyond the power of the criminal law-making authority to proscribe'"; or (2) the new procedural rule requires "procedures without which the likelihood of an accurate conviction is seriously diminished."[29]

Applying the principles of both Griffith and Teague, we must address two issues:  First, when does a military justice case become final to trigger the application of Teague?  Second, do either of the Teague exceptions pertain to this case?

We hold that a military justice case is final for purposes of Teague when "there is a final judgment as to the legality of the proceedings" under Article 71(c), UCMJ.  Article 71(c)(1), UCMJ, provides:

---

[28] 489 U.S. 288 (1989) (plurality opinion).  We acknowledge the question of whether Teague applies to the review of federal convictions remains an open question, although the weight of authority suggests that it should apply in such proceedings. See Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice and Procedure § 25.1, at 1146 n.25, § 25.6, at 1226–28 (5th ed. 2005).
[29] 489 U.S. at 311-13 (citation omitted).

> If a sentence extends to death, dismissal, or a dishonorable or bad-conduct discharge and if the right of the accused to appellate review is not waived, and an appeal is not withdrawn, under section 861 of this title (article 61), that part of the sentence extending to death, dismissal, or a dishonorable or bad-conduct discharge may not be executed until there is a final judgment as to the legality of the proceedings (and with respect to death or dismissal, approval under subsection (a) or (b), as appropriate). A judgment as to legality of the proceedings is final in such cases when review is completed by a Court of Criminal Appeals and --
>> (A) the time for the accused to file a petition for review by the Court of Appeals for the Armed Forces has expired and the accused has not filed a timely petition for such review and the case is not otherwise under review by that Court;
>> (B) such a petition is rejected by the Court of Appeals for the Armed Forces; or
>> (C) review is completed in accordance with the judgment of the Court of Appeals for the Armed Forces and --
>>> (i) a petition for a writ of certiorari is not filed within the time limits prescribed by the Supreme Court;
>>> (ii) such a petition is rejected by the Supreme Court; or
>>> (iii) review is otherwise completed in accordance with the judgment of the Supreme Court.

The plain language of this statute identifies the events that complete appellate review and establishes when judgments are final as to the legality of the proceedings. The clear import of this provision is to certify the legality of the proceedings and permit action on the sentence to be taken under Article 71(a) or (b), UCMJ.

We conclude that Petitioner's conviction and sentence are final for purposes of application of Teague because all of his direct judicial appeals have been exhausted. The requirement of

9

Article 71(c)(1)(C)(iii), UCMJ, to establish "a final judgment as to the legality of the proceedings" has been met.

Presently, this Court has completed direct review, and the Supreme Court granted certiorari and eventually, affirmed this Court's decision.[30] As review by the Supreme Court is completed in accordance with the judgment of the Supreme Court, this case is final for Teague purposes.

All that remains for the case to become final under Article 76, UCMJ,[31] and therefore in the military justice system, is the President's decision whether to order the death sentence executed or to grant executive clemency. We have stated that the "Presidential action is akin to a state governor's action, and as such, is not part of the direct judicial review of the case."[32]

Supreme Court precedent supports our conclusion of when a case is final for Teague purposes. Quoting its earlier decision in Allen v. Hardy,[33] the Supreme Court in Teague defined a "final" conviction in a state court as one "'where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari had elapsed.'"[34]

---

[30] Loving, 517 U.S. at 774.
[31] 10 U.S.C. § 876 (2000).
[32] Loving, 62 M.J. at 247.
[33] 478 U.S. 255, 258 n.1 (1986).
[34] 489 U.S. at 295; see also Griffith, 479 U.S. at 321 n.6.

10

Moreover, in Clay v. United States,[35] the Supreme Court defined finality with respect to cases where it has granted a petition for certiorari. The Supreme Court first observed that the precise meaning of finality depends on context. It then explained:

> Here, the relevant context is postconviction relief, a context in which finality has a long-recognized, clear meaning: Finality attaches when this Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires.[36]

Our conclusion that a military justice case is final for Teague purposes when "there is a final judgment as to the legality of the proceedings" under Article 71(c), UCMJ, is consistent with this authority.

Moreover, we view this construction of finality for Teague purposes as placing a servicemember in the similar position as other federal and state prisoners where the law applicable to their case is generally established after direct review is complete.[37] If a servicemember, after Supreme Court review, received the benefit of all new constitutional rules, a military

---

[35] 537 U.S. 522, 527 (2003).

[36] Id.

[37] See Teague, 489 U.S. at 310; 28 U.S.C. § 2254(d)(1) (2000) (limiting relief to claims based on legal rules actually in effect when the state court decided the cases, as opposed to those in effect during the much longer period that elapses before the conviction becomes final); 28 U.S.C. § 2255 (2000) (limiting relief for federal prisoners to claims based on "violations of the Constitution or laws of the United States . . . or is otherwise subject to collateral attack . . . .").

accused could continue to litigate a case indefinitely thereby thwarting application of the rule of finality. Teague did not sanction such an unending litigation procedure and neither do we.

We therefore reject any construction of the UCMJ that would permit such endless litigation. Instead, we embrace the language of Article 71(c), UCMJ, defining a "final judgment as to the legality of the proceedings" as the event that triggers an application of Teague. Having addressed when a military justice case becomes final to trigger the application of Teague, we turn to the application of Teague to this capital case.[38]

In Teague, the Supreme Court left open the issue of application of the Teague principle to a capital case. But the Supreme Court recently decided this issue in Schriro v. Summerlin.[39] Applying Teague in a capital case, the Court reaffirmed Teague's holding relating to retroactivity of new constitutional rules and clarified the distinction between substantive and procedural rules stating:

> New substantive rules generally apply retroactively. This includes decisions that narrow the scope of a criminal statute by interpreting its terms, see Bousley v. United States, 523 U.S. 614 (1998), as well as constitutional determinations that place particular conduct or persons

_____

[38] Teague was not a capital case, and the Supreme Court expressly stated, "Because petitioner is not under sentence of death, we need not, and do not, express any views as to how the retroactivity approach we adopt today is to be applied in the capital sentencing context." 489 U.S. at 314 n.2.
[39] 542 U.S. 348 (2004).

covered by the statute beyond the State's power to punish, see Saffle v. Parks, 494 U.S. 484, 494-495 (1990); Teague v. Lane, 489 U.S. 288, 311 (1989) (plurality opinion). Such rules apply retroactively because they "necessarily carry a significant risk that a defendant stands convicted of 'an act that the law does not make criminal'" or faces a punishment that the law cannot impose upon him. Bousley, supra, at 620 (quoting Davis v. United States, 417 U.S. 333, 346 (1974)).

New rules of procedure, on the other hand, generally do not apply retroactively. They do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise. Because of this more speculative connection to innocence, we give retroactive effect to only a small set of "'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." Saffle, supra, at 495 (quoting Teague, 489 U.S. at 311). That a new procedural rule is "fundamental" in some abstract sense is not enough; the rule must be one "without which the likelihood of an accurate conviction is seriously diminished." Id. at 313 (emphasis added). This class of rules is extremely narrow, and "it is unlikely that any . . . 'ha[s] yet to emerge.'" Tyler v. Cain, 533 U.S. 656, 667 n.7 (2001) (quoting Sawyer v. Smith, 497 U.S. 227, 243 (1990)).[40]

Applying these standards in Schriro, the Supreme Court expressly addressed whether its recent decision in Ring applied retroactively.[41] The respondent, Summerlin, was convicted of first-degree murder and sentenced to death.[42] Under the Arizona capital sentencing scheme, a judge, instead of a jury, found the aggravating circumstance that rendered him death-eligible. After direct review was complete, the Supreme Court decided

---

[40] Id. at 351-52 (footnote omitted).
[41] Id. at 352-56.
[42] Id. at 350.

Apprendi.[43]  Apprendi was the legal predicate for the later Ring

holding that a jury must find the aggravating factor.[44]

In his federal habeas case, Summerlin sought to invalidate

his death sentence relying on Ring.[45]  But the Supreme Court, in

Schriro, applied Teague to capital cases and clarified Teague's

distinction between substantive and procedural rules.[46]  The

Court held that the then-recent decisions in Ring and implicitly

in Apprendi, as Ring's legal predicate, are "properly classified

as procedural" and do not apply retroactively to cases that have

completed direct review.[47]  The Court reasoned that neither of

the two exceptions to Teague applied to Summerlin's collateral

attack to trigger the retroactive application of Ring.[48]

The Supreme Court rejected the position that Ring was a

substantive new rule stating:

> Respondent nevertheless argues that Ring is
> substantive because it modified the elements of the offense
> for which he was convicted.  He relies on our statement in
> Ring that, "[b]ecause Arizona's enumerated aggravating
> factors operate as 'the functional equivalent of an element
> of a greater offense,' the Sixth Amendment requires that
> they be found by a jury."  [Ring v. Arizona,] 536 U.S. at
> 609 (citation omitted); see also Sattazahn v. Pennsylvania,
> 537 U.S. 101, 111 (2003) (plurality opinion).  The Ninth
> Circuit agreed, concluding that Ring "reposition[ed]
> Arizona's aggravating factors as elements of the separate
> offense of capital murder and reshap[ed] the structure of

---

[43]  Id.
[44]  Id. at 351.
[45]  Id.
[46]  Id. at 352-58.
[47]  Id. at 353.
[48]  Id. at 352-56.

Arizona murder law."  341 F.3d at 1105.

A decision that modifies the elements of an offense is normally substantive rather than procedural.  New elements alter the range of conduct the statute punishes, rendering some formerly unlawful conduct lawful or vice versa.  See Bousley, 523 U.S. at 620-21.  But that is not what Ring did; the range of conduct punished by death in Arizona was the same before Ring as after.  Ring held that, because Arizona's statutory aggravators restricted (as a matter of state law) the class of death-eligible defendants, those aggravators effectively were elements for federal constitutional purposes, and so were subject to the procedural requirements the Constitution attaches to trial of elements.  536 U.S. at 609.  This Court's holding that, because Arizona has made a certain fact essential to the death penalty, that fact must be found by a jury, is not the same as this Court's making a certain fact essential to the death penalty.  The former was a procedural holding; the latter would be substantive.  The Ninth Circuit's conclusion that Ring nonetheless "reshap[ed] the structure of Arizona murder law," 341 F.3d at 1105, is particularly remarkable in the face of the Arizona Supreme Court's previous conclusion to the contrary.  See State v. Towery, 204 Ariz. 386, 390-91, 64 P.3d 828, 832-33, cert. dism'd, 539 U.S. 986 (2003).[49]

As a predicate for discussing the possible retroactive application of Ring under the second exception of Teague, the Supreme Court further explained why Ring was a new procedural rule stating:

> Ring's holding is properly classified as procedural.  Ring held that "a sentencing judge, sitting without a jury, [may not] find an aggravating circumstance necessary for imposition of the death penalty."  536 U.S. at 609.  Rather, "the Sixth Amendment requires that [those circumstances] be found by a jury."  Ibid.  This holding did not alter the range of conduct Arizona law subjected to the death penalty.  It could not have; it rested entirely on the Sixth Amendment's jury-trial guarantee, a provision that has nothing to do with the range of conduct a State may criminalize.  Instead, Ring altered the range of

---

[49] Id. at 354-55.

permissible methods for determining whether a defendant's conduct is punishable by death, requiring that a jury rather than a judge find the essential facts bearing on punishment. Rules that allocate decisionmaking authority in this fashion are prototypical procedural rules, a conclusion we have reached in numerous other contexts.[50]

Having concluded that the new rule of Ring was procedural, the Supreme Court next addressed whether Ring fell under the retroactivity exception for "'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding."[51] Rejecting a variety of arguments that a jury is a more accurate factfinder, the Supreme Court concluded that it "cannot confidently say that judicial factfinding seriously diminishes accuracy."[52] The Supreme Court found its conclusion supported by its prior "decision in DeStefano v. Woods, 392 U.S. 631 (1968) (per curiam) . . . [where] we refused to give retroactive effect to Duncan v. Louisiana, 391 U.S. 145 (1968), which applied the Sixth Amendment's jury-trial guarantee to the States."[53]

Notwithstanding this authority, Petitioner attempts to rely on the authority of Ring to support his habeas petition. In light of Schriro, we conclude that, based on the foregoing discussion, Petitioner cannot avail himself of the authority of Ring to support his petition.

---

[50] Id. at 353.
[51] Id. at 352 (quoting Saffle, 494 U.S. at 495, quoting Teague, 489 U.S. at 311) (quotation marks omitted).
[52] Id. at 356.
[53] Id. at 356-57.

16

Also, we consider whether Petitioner can rely on the authority of <u>Apprendi</u> to support his habeas petition.  In <u>Apprendi</u>, the Supreme Court held that other than the fact of a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum," whether the statute calls it an element or a sentencing factor, "must be submitted to a jury, and proved beyond a reasonable doubt."[54]  We conclude that Petitioner cannot rely on <u>Apprendi</u> in this collateral attack as it does not apply in post-conviction cases.[55]

We expressly reject Petitioner's suggestion that we depart from Supreme Court precedent because of the unique circumstances of military justice and that we formulate a more generous rule to permit Petitioner to avail himself of the retroactive application of <u>Apprendi</u> and <u>Ring</u>.  In part because military

---

[54] 530 U.S. at 490.

[55] <u>See</u> <u>Schriro</u>, 542 U.S. at 358 (stating that "<u>Ring</u> announced a new procedural rule that does not apply retroactively to cases already final on direct review"); <u>see also</u> <u>Blakely v. Washington</u>, 542 U.S. 296, 323 (2004) (O'Connor, J., Rehnquist, C.J., and Kennedy, J., dissenting) (stating "that <u>Ring</u> (and <u>a fortiori</u> <u>Apprendi</u>) does not apply retroactively on habeas review . . . ."); <u>Harris v. United States</u>, 536 U.S. 545, 581 (2002) (Thomas, J., Stevens, J., Souter, J., and Ginsburg, J., dissenting) ("No Court of Appeals, let alone this Court, has held that <u>Apprendi</u> has retroactive effect."); <u>see, e.g.</u>, <u>Coleman v. United States</u>, 329 F.3d 77, 82 (2d Cir. 2003) (noting that "at least seven United States Courts of Appeals have held that . . . <u>Apprendi</u>'s new rule does not apply retroactively . . . ."); <u>United States v. Sanchez-Cervantes</u>, 282 F.3d 664, 671 (9th Cir. 2002) ("[W]e hold that <u>Apprendi</u> does not apply retroactively to cases on initial collateral review.").

cases go through a similar review as both federal and state capital cases, there is no basis for a different military rule to determine whether new law will have retroactive application. Moreover, we are comfortable adhering to the Supreme Court's Teague analysis because in doing so we comply with the congressional mandate that courts-martial "apply the principles of law . . . generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with [the UCMJ]."[56]

In summary, in light of the previously discussed Supreme Court precedent, we conclude that Petitioner cannot rely on either Ring or Apprendi to support his habeas petition. Therefore, we need not further address any of Petitioner's issues relying on the authority of either Ring or Apprendi.

Finally, we consider whether Petitioner can rely on the authority of Wiggins to support his habeas petition. The simple answer is an unequivocal yes. Unlike the recent cases of Ring and Apprendi, Wiggins did not announce a new constitutional rule. Wiggins is a post-conviction attack alleging ineffective assistance of counsel during capital sentencing and applying the "clearly established" legal principles that govern claims of

---

[56] Article 36, UCMJ, 10 U.S.C. § 836 (2000).

18

ineffective assistance of counsel in <u>Strickland</u>.[57]  The Supreme

Court in explaining the procedural context of <u>Wiggins</u> stated,

> The amendments to 28 USC § 2254 [28 USCS § 2254], enacted
> as part of the Antiterrorism and Effective Death Penalty
> Act of 1996 (AEDPA), circumscribe our consideration of
> Wiggins' claim and require us to limit our analysis to the
> law as it was "clearly established" by our precedents at
> the time of the state court's decision.[58]

At its core, <u>Wiggins</u> addresses a misapplication of the

"clearly established" legal principles of <u>Strickland</u>.[59]  As such,

both <u>Wiggins</u> and <u>Strickland</u> present governing legal authority

relevant to Petitioner's habeas petition.  We now turn to the

merits of Petitioner's arguments relating to <u>Wiggins</u>.

IV.  The <u>Wiggins</u> Issue

A.  <u>The Supreme Court's Decision in Wiggins</u>

In <u>Wiggins</u>, the Supreme Court provided some guidance as to

what is a reasonable investigation in the context of a death

penalty case.[60]  The Supreme Court was not concerned with whether

defense counsel should have presented a mitigation case.

Instead, the narrow issue was "whether the investigation

supporting [defense] counsel's decision not to introduce

mitigating evidence of Wiggins' background <u>was itself</u>

<u>reasonable</u>."[61]  The focus was to evaluate if the defense

investigation was reasonable to establish the factual predicate

---

[57] <u>Wiggins</u>, 539 U.S. at 522.
[58] <u>Id.</u> at 520.
[59] <u>Id.</u>
[60] <u>Id.</u> at 522-534.
[61] <u>Id.</u> at 523.

so that counsel would be in a position later to make reasonable tactical decisions.

At the outset the opinion reaffirmed that the analysis of this issue must be conducted in light of the established precedent of Strickland, stating:

> We established the legal principles that govern claims of ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984). An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. Id. at 687. To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." Id. at 688. We have declined to articulate specific guidelines for appropriate attorney conduct and instead have emphasized that "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms."[62]

The Supreme Court noted that both Strickland and Wiggins "stem[] from counsel's decision to limit the scope of their investigation into potential mitigating evidence."[63] Then the Supreme Court again quoted Strickland to explain that the deference given to strategic judgments depends on the adequacy of the investigations supporting those judgments:

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a

---

[62] Id. at 521.
[63] Id.

20

reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.[64]

Finally, the Supreme Court explained that any assessment of counsel is an objective inquiry that is "context-dependent."[65] That is, reasonableness under professional norms must be evaluated "'from counsel's perspective at the time.'"[66]

Applying these principles, the Supreme Court evaluated defense counsel's decision in a capital case not to expand their investigation beyond a presentence investigation report prepared by the Division of Parole and Probation and Department of Social Services records documenting foster care placements of Wiggins.[67] The Supreme Court concluded that this decision to limit the investigation "fell short of the professional standards that prevailed in Maryland in 1989."[68]

The Supreme Court also reasoned that the scope of the investigation was unreasonable in light of the notice counsel had of Wiggins's tragic and troubled childhood; counsel had obtained this information from the presentence investigation report prepared by the Division of Parole and Probation and

---

[64] Id. at 521-22 (quoting Strickland, 466 U.S. at 690-91).
[65] Id. at 523.
[66] Id. (quoting Strickland, 466 U.S. at 689).
[67] Id. at 522-531.
[68] Id. at 524.

21

Department of Social Services records.[69]  These documents

presented factual red flags of Wiggins's problematic past that

included:  "[p]etitioner's mother was a chronic alcoholic;

Wiggins was shuttled from foster home to foster home and

displayed some emotional difficulties while there; he had

frequent, lengthy absences from school; and, on at least one

occasion, his mother left him and his siblings alone for days

without food."[70]

The Supreme Court stated that "any reasonably competent

attorney would have realized that pursuing these leads was

necessary to making an informed choice among possible defenses,

particularly given the apparent absence of any aggravating

factors in petitioner's background."[71]  Furthermore, the Supreme

Court emphasized there was no evidence that "further

investigation would have been fruitless."[72]  The Supreme Court

also stated that defense counsel's "failure to investigate

thoroughly resulted from inattention, not reasoned strategic

judgment."[73]

Linking its decision again to the Strickland standard, the

Supreme Court concluded that, "Even assuming [defense counsel]

limited the scope of their investigation for strategic reasons,

---

[69]  Id. at 527-28, 534.
[70]  Id. at 525.
[71]  Id.
[72]  Id.
[73]  Id. at 526.

Strickland does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. <u>Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy.</u>"[74]

In finding defense counsel in <u>Wiggins</u> deficient, the Supreme Court emphasized "that <u>Strickland</u> does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does <u>Strickland</u> require defense counsel to present mitigating evidence at sentencing in every case."[75] The Supreme Court made clear the basis for its conclusion of deficient representation here -- "that 'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.'"[76] Finally, the Supreme Court established this simple benchmark as the legal test for evaluating a defense investigation: "A decision not to investigate thus 'must be directly assessed for reasonableness in all the circumstances.'"[77]

---

[74] <u>Id.</u> at 527 (emphasis added).
[75] <u>Id.</u> at 533.
[76] <u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 690-91).
[77] <u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 691).

Having found defense counsel deficient, the Supreme Court turned to the second prong of the Strickland analysis to evaluate prejudice.[78]  The Court found that the mitigating evidence counsel failed to discover and present in this case was "powerful."[79]  This evidence of Wiggins's abuse included the following:

> Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother.  He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care.  The time Wiggins spent homeless, along with his diminished mental capacities, further augment his mitigation case.  Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability.[80]

The Supreme Court explained that based on "both the nature and the extent of the abuse petitioner suffered, we find there to be a reasonable probability that a competent attorney, aware of this history, would have introduced it at sentencing in an admissible form."[81]  The Supreme Court then concluded "that had the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence."[82]  Accordingly, the death

---

[78] Id. at 534–35.
[79] Id. at 534.
[80] Id. at 535 (citing Penry v. Lynaugh, 492 U.S. 302, 319 (1989), abrogated on other grounds by Atkins v. Virginia, 536 U.S. 304 (2002)).
[81] Id.
[82] Id. at 536.

sentence was set aside and the case remanded for further

proceedings.[83]

### B.  Relationship of Wiggins to this Court's Prior Consideration of the Issue of Ineffective Assistance of Counsel Arising From Failing to Reasonably Investigate the Defense Case in Extenuation and Mitigation

In considering Petitioner's ineffective assistance of

counsel claim, this Court looks to the law in effect at the time

of the original 1994 decision on direct appeal.  That is what

the Supreme Court did in *Wiggins*.[84]

*Wiggins* did not make new law.[85]  But it did both clarify and

illuminate the standards for a reasonable investigation in a

criminal trial, in general, and in a death penalty case, in

particular.  The import of *Wiggins* is that it serves as an

example of how the prior *Strickland* standards should be applied.

Simply stated, the value of *Wiggins* is to provide guidance in

the application of the well established precedent of *Strickland*

regarding the scope of a reasonable investigation in a death

penalty case.  Therefore, we use *Wiggins* to inform our approach

under *Strickland*, as opposed to treating it as a new precedent

or rule.[86]  *Wiggins* is a new lens through which we view a

fundamental principle of law relating to the application of the

---

[83] *Id.* at 538.
[84] *Id.* at 521-22; *see* *Williams v. Taylor*, 529 U.S. 362, 390 (2000).
[85] *See* 539 U.S. at 522.
[86] *See* *Slaughter v. Parker*, 450 F.3d 224, 234 (6th Cir. 2006); *Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003).

Strickland standards for a reasonable investigation in a capital case. In light of Wiggins, we have a clearer view of the application of Strickland in this death penalty context.

We also apply Wiggins to the present case not in the context of a direct appeal, but instead, in the context of Petitioner's habeas petition filed with this Court. The petition was filed during the period after there was a final judgment as to the legality of the proceedings under Article 71(c)(1), UCMJ, but before the case is final under Article 76, UCMJ. This Court has not previously articulated standards for habeas review under the All Writs Act of convictions following completion of Article 71, UCMJ, review.[87] Therefore, it is appropriate now that we address those standards.

It appears that the Article III courts have not been able to develop a consistent standard for collateral review of courts-martial under 28 U.S.C. § 2241 (2000). In United States ex rel. New v. Rumsfeld,[88] the United States Court of Appeals for the District of Columbia Circuit recently described the case law as so "tangled" and marked by "uncertainty" that it left the court with "serious doubt whether the judicial mind is really

---

[87] Our parallel treatment of other forms of collateral review under the All Writs Act also has not focused on the standard of review. See, e.g., Garrett v. Lowe, 39 M.J. 293 (C.M.A. 1994).
[88] 448 F.3d 403 (D.C. Cir. 2006).

capable of applying the sort of fine gradations in deference that the varying formulae may indicate."[89]

In New, the court decided that it could proceed without resolving the question of which standard it should apply.[90]  In the course of its discussion, the court noted that the United States Court of Appeals for the Third Circuit in Brosius v. Warden,[91] had applied to court-martial cases the standards under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), codified principally at 28 U.S.C. §§ 2244-2254 (2000), for reviewing state court decisions.[92]  In Brosius, the court said:

> Whatever Burns [v. Wilson, 346 U.S. 137 (1953)]  means, we have no doubt that at least absent a challenge to the constitutionality of the statute under which the defendant was convicted, such as that raised in Levy, our inquiry in a military habeas case may not go further than our inquiry in a state habeas case.  Thus, we will assume -- but solely for the sake of argument -- that we may review determinations made by the military courts in this case as if they were determinations made by state courts.  Accordingly, we will assume that 28 U.S.C. § 2254(e)(1) applies to findings of historical fact made by the military courts.  Under this provision, "a determination of a factual issue made by a State court" is "presumed to be correct," and a habeas petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  In considering other determinations

---

[89] Id. at 406-08.
[90] Id. at 408.
[91] 278 F.3d 239 (3d Cir. 2002).
[92] New, 448 F.3d at 407-408.  A recent law review note also suggested that Article III courts import the AEDPA standards for reviewing state decisions into Article III review of military cases.  John K. Chapman, Note, Reforming Federal Habeas Review of Military Convictions:  Why AEDPA Would Improve the Scope and Standard of Review, 57 Vand. L. Rev. 1387 (2004).

made by the military courts, we will assume that 28 U.S.C. § 2254(d) applies.  Under this provision,

> an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[93]

The task before Article III courts, of course, is different from the task before us.  Article III courts are external to the military justice system, so they need to determine what standard comports with the full and fair requirement in Burns v. Wilson.[94] As our consideration of this case is within the UCMJ system before a case is final under Article 76, UCMJ, we must decide what standard best meets the "necessary or appropriate"

---

[93] Brosius, 278 F.3d at 245 (citation omitted).
[94] 346 U.S. 137, 141-43 (1953);  see generally Chapman, supra note 92, at 1399-1402; Dwight H. Sullivan, The Last Line of Defense:  Federal Habeas Review of Military Death Penalty Cases, 144 Mil. L. Rev. 1 (1994); Richard D. Rosen, Civilian Courts and the Military Justice System:  Collateral Review of Courts-Martial, 108 Mil. L. Rev. 5 (1985).

requirements in the All Writs Act for collateral review within the military justice system.[95]

To that end, we look for standards that fulfill the basic purposes of the military justice system:  balancing the individual right to a habeas review against the need for timely, certain, and final review.  In our view, rather than creating our own standard, we should look to the balance that Congress has legislated under the AEDPA.

In the AEDPA, Congress limits granting relief on habeas corpus claims to those where a proceeding on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.[96]

We adopt these AEDPA standards as to both the scope of review and the standard of review to evaluate habeas corpus claims raising issues of constitutional law.[97]  That is, we will determine whether this Court's prior review:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that

---

[95] See 28 U.S.C. § 1651(a); Loving, 62 M.J. at 246-47.

[96] 28 U.S.C. § 2254(d).

[97] We do not address in this case the question of what standard this federal court should apply when dealing with a collateral attack on a federal conviction and sentence when the claim is based upon nonconstitutional federal law.  See Hertz & Liebman, supra note 28, § 41.3b, at 1922-27.

29

was based on an unreasonable determination of the facts in light of the evidence presented in the [prior] proceeding.[98]

With respect to the factual component of a mixed fact/law question in the prior proceeding: "a determination of a factual issue made [in the prior proceeding] is "presumed to be correct," and a habeas petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."[99]

We decline to adopt the provisions of 28 U.S.C. § 2255 (2000) as to a habeas petition that raises a constitutional issue. We note that 28 U.S.C. § 2255 initially appears to be an attractive option as to the standards for collateral review of courts-martial, because this statute pertains generally to collateral attacks on federal convictions. This procedure is akin to a federal prisoner filing a motion to vacate a sentence and is heard by the same judge that initially heard the criminal trial on the merits.[100] But in our most recent decision relating to this case, we explained that Petitioner cannot obtain habeas review under 28 U.S.C. § 2255 because "in the military justice system there are no standing courts . . . ."[101] In our view, the procedures Congress established for the sentencing tribunal to review in a case under 28 U.S.C. § 2255 are unsuitable and

---

[98] 28 U.S.C. § 2254(d).
[99] 28 U.S.C. § 2254(e)(1).
[100] 28 U.S.C. § 2255.
[101] Loving, 62 M.J. at 254.

inappropriate to guide this Court's consideration of a collateral habeas petition.

Our adoption of the AEDPA provisons for reviewing state court decisions, codified at 28 U.S.C. §§ 2244-2254, makes federal habeas review by this Court the same as habeas review of state convictions in other federal courts.  These provisions best serve to protect the liberty and interests of individual servicemembers and to bolster deference to military legal determinations.[102]  We need not address here all the issues relating to the application of the AEDPA to a collateral challenge to a court-martial judgment in general or to the present pleading in particular.[103]  We need only presently address the legal standard to measure Petitioner's right to an evidentiary hearing on his claim.[104]

---

[102] Chapman, supra note 92, at 1428.

[103] See Loving, 62 M.J. at 259 (stating that "it is not clear whether our entertaining a petition for a writ of habeas corpus would trigger the AEDPA 'second or successive writ' language and thereby preclude an Article III court collateral review under the doctrine of abuse of the writ").

[104] A fundamental error of the dissent is its erroneously confusing two separate issues -- further review or consideration of a habeas petition and actually granting habeas relief.  The dissent cites the legal test for granting relief under the AEDPA to support its conclusion that the "AEDPA bars further review of this issue."  In the view of the majority, the narrow issue here is only whether Petitioner has met the legal standard to establish his right to an evidentiary hearing on his claim of ineffective assistance of counsel.  The dissent does not address this issue but instead decides the merits of the habeas petition.

To address this issue, we look first to the relevant provisions of the AEDPA, 28 U.S.C. § 2254(e)(2), that explicitly address when a Petitioner is not entitled to an evidentiary hearing. This statute states:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that --
>> (A) the claim relies on --
>>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

This congressional direction as to when a habeas corpus applicant is not entitled to an evidentiary hearing is not applicable here. The condition precedent ("applicant has failed to develop the factual basis of a claim in State court proceedings") is not present in this case.[105] Indeed, the

---

[105] See Earp v. Ornoski, 431 F.3d 1158, 1166 (9th Cir. 2005), where the court stated:

> In determining whether a petitioner is entitled to an evidentiary hearing under AEDPA, the district court must:
>> determine whether a factual basis exists in the record to support the petitioner's claim. If it does not, and an evidentiary hearing might be appropriate, the court's

documents to support and raise the issue of ineffective

assistance of counsel were originally filed at this Court while

the case was pending on direct review.[106]

As this Court is not precluded from ordering the

evidentiary hearing, we next address whether one is appropriate.

It is appropriate to order an evidentiary hearing where a

petitioner alleges facts which, if proved, would entitle him to

relief, the record reveals a genuine factual dispute as to the

alleged facts, and the petitioner did not receive a hearing on

the issue.[107]  The decision whether to hold an evidentiary

hearing is discretionary.[108]

---

> first task in determining whether to grant
> an evidentiary hearing is to ascertain
> whether the petitioner has 'failed to
> develop the factual basis of a claim in
> State court.' . . . . If [] the applicant
> has not 'failed to develop' the facts in
> state court, the district court may proceed
> to consider whether a hearing is appropriate
> or required under Townsend v. Sain, 372 U.S.
> 293 (1963) [overruled on other grounds in
> Keeney v. Tamayo-Reyes, 504 U.S. 1, 5
> (1992)].

[106] When his case was pending before this Court on direct appeal,
Petitioner filed numerous documents with this Court to support
his claim that trial defense counsel was ineffective in failing
to request funds for a mitigation specialist or in failing to
present a cohesive, comprehensive background, including social,
medical and environmental history.  Petitioner has filed
duplicates with the present habeas petition.  We note that on
direct appeal the Government also filed affidavits relevant to
these issues.
[107] See Martinez v. Dretke, 111 F. App'x 224, 229 (5th Cir.
2004), where the court noted:

We view this AEDPA standard, 28 U.S.C. § 2254, for the right to an evidentiary hearing as substantially the same standard that we have applied to evaluate an appellant's right to an evidentiary hearing if the issue of ineffective assistance of counsel is raised on direct appeal.[109]  Therefore, for purposes of resolving a factual component, we will apply the

---

Where the petitioner's allegations cannot be resolved without examining evidence beyond the record, the district court should conduct a hearing.  An evidentiary hearing is required where a state habeas petitioner did not receive a state court hearing and alleges facts which, if proved, would entitle him to relief, and the record reveals a genuine factual dispute as to the alleged facts.

Footnotes omitted; Bell v. True, 413 F. Supp. 2d 657, 699 (W.D. Va. 2006) (holding that an evidentiary hearing was appropriate to address the issue of failure of trial counsel's to conduct a reasonable background investigation in a capital case where a petitioner establishes "facts that, if true, would entitle him to relief," and it appears from the record that "the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing") (citations and quotation marks omitted); King v. Bell, 392 F. Supp. 2d 964, 974 (M.D. Tenn. 2005) ("King is entitled to an evidentiary hearing if he alleges sufficient grounds for issuance of the writ, relevant facts are in dispute, and the state courts did not hold a full and fair evidentiary hearing."); Marshall v. Hendricks, 103 F. Supp. 2d 749, 767-69 (D.N.J. 2000) (addressing the power of a federal court to hold an evidentiary hearing to address a habeas claim arising out of a state court proceeding), rev'd in part by 307 F.3d 36 (3d Cir. 2002).  We observe that we do not evaluate Petitioner's right to an evidentiary hearing under the standards to evaluate successor habeas claims.

[108] 2 Steven Alan Childress & Martha S. Davis, Federal Standards of Review § 13.08, at 13-59 (3d ed. 1999).

[109] See United States v. Murphy, 50 M.J. 4, 16 (C.A.A.F. 1998) ("An appellant is entitled to an evidentiary hearing if his or her posttrial affidavits raise material questions of fact that might give rise to relief.").

factors identified in United States v. Ginn[110] in determining

whether a DuBay evidentiary hearing is required.

As Petitioner's case is not yet final, we conclude that the

application of this standard is appropriate because of the

unique status of this Court and the present posture of

Petitioner's case which is still within the military justice

---

[110] 47 M.J. 236 (C.A.A.F. 1997). In Ginn, we stated that the following principles apply in evaluating whether a post-trial evidentiary hearing is necessary:

> First, if the facts alleged in the affidavit allege an error that would not result in relief even if any factual dispute were resolved in appellant's favor, the claim may be rejected on that basis.
> Second, if the affidavit does not set forth specific facts but consists instead of speculative or conclusory observations, the claim may be rejected on that basis.
> Third, if the affidavit is factually adequate on its face to state a claim of legal error and the Government either does not contest the relevant facts or offers an affidavit that expressly agrees with those facts, the court can proceed to decide the legal issue on the basis of those uncontroverted facts.
> Fourth, if the affidavit is factually adequate on its face but the appellate filings and the record as a whole "compellingly demonstrate" the improbability of those facts, the Court may discount those factual assertions and decide the legal issue.
> Fifth, when an appellate claim of ineffective representation contradicts a matter that is within the record of a guilty plea, an appellate court may decide the issue on the basis of the appellate file and record (including the admissions made in the plea inquiry at trial and appellant's expression of satisfaction with counsel at trial) unless the appellant sets forth facts that would rationally explain why he would have made such statements at trial but not upon appeal.
> Sixth, the Court of Criminal Appeals is required to order a factfinding hearing only when the above-stated circumstances are not met.

Id. at 248.

system.  Our application of this same rule will result in consistent evaluation of this right to an evidentiary claim as long as the case is not yet final under the UCMJ.  Applying this "objective evidence" standard here, we conclude for several reasons that an evidentiary hearing is necessary.

The application of both Strickland and Wiggins to this case is rooted in the Petitioner's constitutional right to effective assistance of counsel.  The decision in Wiggins states that a reasonable investigation is a necessary predicate for any tactical decisions by counsel.[111]  In light of Wiggins, our evaluation of an ineffective assistance of counsel claim in a capital case must focus on the defense investigation to determine if it was reasonable.[112]

In our initial consideration of the merits of this case on direct appeal this Court addressed defense counsel's investigation.[113]  Our opinion states "defense counsel conducted his own investigation,"[114] and we proceeded to explain how defense counsel made reasonable tactical decisions related to the sentencing proceeding (including the decision not to request funding for a mitigation specialist).[115]  Our opinion states:

> We hold further that defense counsel's investigation and
> presentation of defense mitigation evidence and their

---

[111] 539 U.S. at 522-23.
[112] See Rompilla v. Beard, 545 U.S. 374, 377 (2005).
[113] Loving, 41 M.J. at 249-50.
[114] Id. at 249.
[115] Id. at 249-50.

36

decisions regarding use of expert testimony were reasonable. While use of an analysis prepared by an independent mitigation expert is often useful, we decline to hold that such an expert is required. What is required is a reasonable investigation and competent presentation of mitigation evidence. Presentation of mitigation evidence is primarily the responsibility of counsel, not expert witnesses. In this case defense counsel investigated appellant's background and competently presented his evidence during the sentencing phase of the trial.[116]

However, this holding does not adequately develop the factual predicate to support it.[117] The facts in the opinion focus on the evidence offered in mitigation at trial.[118] Our prior opinion did not adequately review the nature of defense counsel's investigation. Moreover, there was no discussion of the prevailing professional norms at the time as to what was a reasonable investigation or the "red flags" that should have alerted defense counsel to dig deeper to determine whether Petitioner was, indeed, the subject of specific childhood harm that might mitigate his culpability as alleged. The statement of legal conclusions and the absence of detailed factual analysis of what defense counsel did and did not do in investigating the case, reveals that our prior opinion did not address whether trial defense counsel "chose to abandon their

---

[116] Id. at 250.
[117] See Wiggins, 539 U.S. at 527-28 (finding an unreasonable application of the Strickland principles when the State "court did not conduct an assessment of whether the decision to cease all investigation . . . actually demonstrated reasonable professional judgment. The state court merely assumed that the investigation was adequate") (citations omitted).
[118] Loving, 41 M.J. at 249-50.

investigation at an unreasonable juncture [thereby] making a fully informed decision with respect to sentencing strategy impossible."[119]

The recent authority of Wiggins reveals that this Court previously did not adequately focus on reasonableness of the defense investigation. This deficiency in our initial decision requires that we now address "whether the investigation supporting counsel's decision[s] . . . was itself reasonable."[120]

Moreover, in our initial consideration of the ineffective assistance of counsel claim on direct review, we did not order an evidentiary hearing regarding this issue. Therefore, Petitioner did not have an adequate opportunity on direct appeal to establish facts in an evidentiary hearing to support his ineffective assistance of counsel claim.[121]

---

[119] Wiggins, 539 U.S. at 527-28.
[120] Id. at 523; see, e.g., Rompilla, 545 U.S. at 377 (concluding that defense counsel were deficient in an investigation where "they failed to make reasonable efforts to review the prior conviction file, despite knowing that the prosecution intended to introduce Rompilla's prior conviction not merely by entering a notice of conviction into evidence but by quoting damaging testimony of the rape victim in that case"); Williams, 529 U.S. at 396 (stating defense counsel has an "obligation to conduct a thorough investigation of the defendant's background" (citing American Bar Association Standards for Criminal Justice 4-4.1, Commentary, at 4-55 (2d ed. 1980))).
[121] We observe that our ordering an evidentiary hearing is consistent with the approach of other courts that have addressed the issue of ineffective assistance of counsel based on the failure to investigate. See, e.g., Syriani v. Polk, 118 F. App'x 706, 721 (4th Cir. 2004) (denying a habeas petition alleging ineffective assistance based on a state court evidentiary hearing and on the conclusion that the jury had been

We acknowledge that Petitioner perhaps could have raised on direct appeal the precise issue that he now presents in his habeas petition because the present claim is based on the standards of a reasonable investigation stated in Strickland. But in Massaro v. United States,[122] the Supreme Court held that an ineffective assistance of counsel issue may be raised in a habeas petition irrespective of whether a petitioner could have raised it on direct appeal.[123] In light of Massaro, the past appellate path of this case does not preclude Petitioner from presenting to this Court his habeas claims of ineffective assistance.

Moreover, in Massaro the Supreme Court recognized that "in most cases a [habeas corpus] motion . . . is preferable to direct appeal for deciding claims of ineffective-assistance."[124] The Supreme Court also stated that a district court, a factfinding forum, rather than an appellate court is "best suited to developing the facts necessary to determining the adequacy of representation during an entire trial."[125] The Supreme Court explained this point stating, "When an

---

presented with similar aggravating factors that the jury had decided were not outweighed by mitigating circumstances); see also Bell, 413 F. Supp. 2d at 699 (holding that petitioner was entitled to evidentiary hearing on ineffective assistance of counsel claim).
[122] 538 U.S. 500 (2003).
[123] Id. at 504.
[124] Id.
[125] Id. at 505.

ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose."[126]  The Supreme Court pointed out the advantages of a habeas proceeding in developing the factual predicate for an ineffective assistance of counsel claim stating that, the "court may take testimony from witnesses for the defendant and the prosecution and from the counsel alleged to have rendered the deficient performance."[127]

In Massaro, the Supreme Court stated it was "not hold[ing] that ineffective-assistance claims must be reserved for collateral review."[128]  Indeed, Massaro does not preclude consideration of an ineffective assistance of counsel claim on direct appeal.  However, if an ineffective assistance of counsel

---

[126] Id. at 504-05.

[127] Id. at 505.  The Supreme Court in Massaro cited United States v. Griffin, 699 F.2d 1102, 1109 (11th Cir. 1983) for the proposition that in a habeas proceeding, the defendant

> has a full opportunity to prove facts establishing
> ineffectiveness of counsel, the government has a full
> opportunity to present evidence to the contrary, the
> district court hears spoken words we can see only in
> print and sees expressions we will never see, and a
> factual record bearing precisely on the issue is
> created.

We observe that in Wiggins, for example, the habeas review considered the record of trial, the facts developed in the post-conviction record, and judicial observations made during the post-conviction proceedings.  539 U.S. at 529-33.

[128] 538 U.S. at 508.

claim is addressed on direct appeal, Massaro leaves open the issue of how to address such cases, noting that "questions may arise in subsequent proceedings under [habeas corpus] concerning the conclusiveness of determinations made on the ineffective-assistance claims raised on direct appeal."[129]

We now must decide how to address the question left open by the Supreme Court in Massaro. We are guided in this matter by the Supreme Court's approach in Massaro which creates a preference in favor of factual development at a hearing.[130] If there has been no hearing, and important factual questions or mixed questions of fact and law remain after direct appeal, then those matters must be addressed in a hearing before a determination can be made under the AEDPA standards.

In this case there has not been an evidentiary hearing on the issue of ineffective assistance of counsel. In light of Massaro, such a hearing is appropriate in our view if there remain important factual questions as to Petitioner's claim of ineffective assistance of counsel.

We note that Petitioner has filed a voluminous set of wide ranging affidavits and documentary evidence to establish the factual predicate for his claim that "trial defense counsels'

---

[129] Id.
[130] Id. at 505-06. We do not view the fact that Massaro involved a habeas petition filed under 28 U.S.C. § 2255 as diminishing its authority for a preference in favor of factual development at a hearing.

41

conduct was deficient because the evidence reveals that counsel failed to adequately investigate and the 'failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment.'" Petitioner asserts this evidence establishes that crucial mitigation evidence existed at the time of his trial, that a reasonable investigation should have produced it, and that the deficient investigation resulted in this substantial mitigation evidence not being presented at the capital sentencing hearing.

Petitioner has also alleged that this deficiency in the investigation of his case prejudiced his capital sentencing proceedings in two ways. Petitioner claims that trial defense counsel failed to identify critical mitigation evidence of Petitioner's childhood and developmental problems arising from a traumatic and dysfunctional family life, his unnatural obsession with his girlfriend, and the impact of both drug and alcohol abuse on Petitioner generally and his offenses in particular. Petitioner further alleges that without this essential mitigation evidence, trial defense counsel was unable to present "any real evidence concerning [his] background or the impact on him, despite counsel's desire and actual argument that the panel should consider this information."

Finally, we consider a most important fact that this is a capital case. The Supreme Court has applied Eighth Amendment

42

principles to the military capital sentencing scheme "in the context of a conviction under Article 118 for murder committed in peacetime within the United States."[131]  Therefore, these constitutional principles pertain in the present case that is also within these parameters.

Two fundamental principles of Eighth Amendment law are the foundation for a reliable determination of a death sentence:  a genuine narrowing of the class of persons eligible to receive the death penalty and individualized sentencing -- a decision on a capital sentence on the basis of the character of the individual and the circumstances of the crime.[132]  As to the second principle, the Supreme Court has stated that "the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime."[133]

Reflecting these principles, this Court has stated:

> One continuous theme is found throughout the death-penalty cases handed down by the Supreme Court over the last 30 years.  That theme is reliability of result.  Thus, the sine qua non of Gregg v. Georgia; Chambers v. Mississippi;

---

[131] Loving, 517 U.S. at 755.

[132] See Blystone v. Pennsylvania, 494 U.S. 299, 306-07 (1990); see also Lowenfield v. Phelps, 484 U.S. 231, 244 (1988) ("The use of 'aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion."); Zant v. Stephens, 462 U.S. 862, 879 (1983) ("What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime."); Tuilaepa v. California, 512 U.S. 967, 971-72 (1994).

[133] Penry, 492 U.S. at 328.

Furman v. Georgia; and Lockhart v. Fretwell; Strickland v. Washington; and Ake v. Oklahoma, is that the Supreme Court has insisted there be a proper functioning of the adversarial system.  A fair reading of these cases demonstrates that, in order for the adversarial system to work properly, the key ingredients are competent counsel; full and fair opportunity to present exculpatory evidence; individualized sentencing procedures; fair opportunity to obtain the services of experts; and fair and impartial judges and juries.[134]

In Wiggins, the Supreme Court again reaffirmed the right of an accused in a capital case to present evidence in mitigation generally, and the type of mitigation evidence arising from a defendant's traumatic background and childhood, character or the circumstances of the crime in particular.  The Supreme Court in Wiggins stated:

Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability.  Penry v. Lynaugh, 492 U.S. 302 (1989) ("'Evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse'"); see also Eddings v. Oklahoma, 455 U.S. 104 (1982) (noting that consideration of the offender's life history is a "'part of the process of inflicting the penalty of death'"); Lockett v. Ohio, 438 U.S. 586 (1978) (invalidating Ohio law that did not permit consideration of aspects of a defendant's background).[135]

The Supreme Court expressly stated that this type of mitigating evidence "is powerful."[136]  We therefore must evaluate the reasonableness of trial defense counsel's investigation

---

[134] Murphy, 50 M.J. at 14-15 (citations omitted).
[135] 539 U.S. at 535.
[136] Id. at 534.

knowing that there was possibly powerful mitigating evidence for trial defense counsel to discover in a reasonable investigation.

Petitioner has filed voluminous unrebutted affidavits[137] with this Court and documentary evidence to support his assertion that trial defense counsel failed to discover through reasonable investigation, and therefore failed to develop at trial, powerful mitigation evidence. The breadth and depth of this alleged information relate to and include the following: Petitioner's parental and family history of alcoholism and substance addiction established Petitioner's genetic proclivity for alcoholism; Petitioner's long history of alcohol abuse explains his early development of alcoholism; Petitioner suffered great physical and emotional abuse arising from both neglect and rejection in his traumatic childhood; Petitioner lived in a world full of poverty, violence, chaos, neglect, and fear; Petitioner was shot at four times and repeatedly beaten. Petitioner alleges that in his case, as in Wiggins, the defense counsel failed to investigate and present "powerful" mitigating evidence.[138] Therefore, Petitioner argues that his case is

---

[137] We note that the Government has never sought to update its affidavits or rebut Petitioner's factual assertions relating to Petitioner's collateral challenge raising the issue of ineffective assistance of counsel arising from a deficient investigation.
[138] See Wiggins, 539 U.S. at 534-35 (detailing the "powerful" mitigation evidence that counsel failed to develop); see also Rompilla, 545 U.S. at 377-79 (reasoning that counsel was ineffective in sentencing and finding prejudice due, in part, to

materially indistinguishable from Wiggins.  Again we consider

most important, as explained above, that in our initial

consideration of the merits of this case, we did not focus on

the investigative aspects leading to defense counsel's tactical

decisions in sentencing and did not previously order a DuBay

hearing to address this issue.  In light of the unique history

of this case and all the other circumstances relating to this

most important issue, we conclude that an evidentiary hearing is

warranted into the circumstances of the representation in this

capital court-martial related to the sentencing phase of the

trial.

Petitioner has presented a potentially meritorious claim of

ineffective assistance of counsel arising from his trial defense

counsel's failure to conduct a reasonable investigation, for not

pursuing leads known to the trial defense counsel relevant to

this matter, and for not expanding the mitigation investigation

into the defendant's traumatic life history.  Petitioner has

produced post-trial material which raises substantial questions

about the reasonableness of the investigation upon which our

1994 decision rested.

As previously stated in Ginn, we identified the

circumstances that permit this Court not to order a factfinding

---

defense counsel's failure to discover and present evidence that
the defendant grew up in a "slum environment" and had a
traumatic and abusive family background).

46

hearing and, therefore, allow this Court to decide the merits of this habeas claim now based solely on the affidavits and the record.[139] None of these circumstances are present here.

The affidavits and other evidence presently before this Court relating to ineffective assistance of counsel is the type of information that under Massaro and Wiggins, must be assessed in a habeas or DuBay hearing. The allegation of ineffective assistance of counsel presents mixed questions of fact and law that require assessment by a DuBay judge as to the credibility of witnesses, and the validity and accuracy of other factual evidence. Just as a habeas proceeding in an Article III court would need to assess this information in a habeas evidentiary hearing proceeding under the AEDPA, we are not in a position to evaluate the correctness of our 1994 decision until the findings of fact are developed by a DuBay judge. In Wiggins, the Supreme Court stated, "In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."[140] We must now determine if information the defense counsel had should have triggered further fruitful investigation into Petitioner's traumatic family background and

___

[139] See 47 M.J. at 243, 248; see also United States v. Perez, 18 C.M.A. 24, 26, 39 C.M.R. 24, 26 (1968).
[140] 539 U.S. at 527.

upbringing and Petitioner's drug and alcohol abuse prior to and during the offenses.

## V. Conclusion

Petitioner is entitled to an evidentiary hearing to establish the factual predicate for his claim. Accordingly, in light of Wiggins, we order an evidentiary hearing pursuant to DuBay to address the matters related to the defense investigation of Petitioner's background and other matters that may have produced evidence in either extenuation or mitigation during the capital sentencing proceeding. The DuBay judge shall enter findings of fact and conclusions of law to address the following matters:

1.  Identify potential sentencing evidence, if any, alleged by the defense that was omitted or incompletely presented at trial.

2.  Address the facts, if any, under (1) that would have been developed through a reasonable investigation by a competent attorney under Strickland. In this regard, what did trial defense counsel do to investigate information to present in the capital sentencing phase of the court-martial? What information, if any, did the counsel know or should have known that would have triggered an investigation into Petitioner's traumatic background or the omitted or incomplete evidence identified under (1)?

3.  What impact did any deficiency in investigating this case, if any, have on tactical decisions made by trial defense counsel (including the decision to use or not to request or to use any expert assistance)? Whether any information identified under (1) could have led to a change in defense counsel's trial tactics in sentencing phase?

4. Were trial defense counsel aware of the information contained in Petitioner's affidavits filed at this Court regarding violence in Petitioner's family home and neighborhood? The DuBay hearing will evaluate the credibility and reliability of all factual information Petitioner has filed with this Court to support his habeas corpus petition.

5. The DuBay hearing will inquire into any other matters that relate to the issue of performance of trial defense counsel of the duty to conduct a reasonable investigation into the background of Petitioner, the omitted or incomplete evidence identified under (1), or any other evidence relevant to the capital sentencing proceeding, in light of prevailing professional norms at the time of the trial.

6. Whether there is a reasonable probability that, but for the omission at information identified under (1) through (5), the result of the sentencing proceeding would have been different? This requires a reweighing of the evidence adduced at trial and in the DuBay proceeding to determine this question: Had the panel been confronted with this evidence, was there a reasonable probability it would have returned a different sentence? The test is whether there is a reasonable probability that at least one member of the panel would have struck a different balance thereby not voting for a death sentence?[141]

The officer conducting the DuBay hearing will make findings of fact and conclusions of law.

## Decision

The record of trial is returned to the Judge Advocate General of the Army for remand to the convening authority who will order a DuBay hearing to consider the previously identified issues. After such proceedings are concluded, the record of trial along with the DuBay judge's findings of fact and

---

[141] See Wiggins, 539 U.S. at 537.

conclusions of law will be returned directly to this Court for further review.

Loving v. United States, No. 06-8006/AR

EFFRON, Judge (concurring in part and in the result):

I agree that Petitioner is entitled to a hearing under United States v. DuBay, 17 C.M.A. 147, 37 C.M.R. 411 (1967), and I agree with the structure of the hearing outlined in the lead opinion.

I write separately to address a threshold question on which we have not previously written:  What standards and procedures should we apply in considering a petition for habeas corpus filed during the period between the completion of direct legal review under Article 71, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 871 (2000), and final action under Article 76, UCMJ, 10 U.S.C. § 876 (2000)?  Legislation and judicial decisions in the Article III courts provide important restrictions on habeas review in the civilian sector.  We should apply those limitations to habeas corpus review of court-martial convictions under the All Writs Act, 28 U.S.C. § 1651(a) (2000).

Applying the pertinent standards and procedures, we should expressly reject Petitioner's request for retroactive application of the Supreme Court's decisions arising after completion of direct review under Article 71, UCMJ.  Likewise, we should apply those standards and procedures to assess the validity of our decision on direct review regarding Petitioner's ineffective assistance of counsel claim under the Sixth Amendment to the Constitution.  U.S. Const. amend VI; see

Strickland v. Washington, 466 U.S. 668 (1984).  In that regard,
we are not bound by our decision on direct review, which reached
a conclusion regarding ineffective representation of counsel --
a mixed question of fact and law -- without first determining
whether Petitioner received a full and fair hearing on the
factual and legal grounds for his claims.

## I.   BACKGROUND

Petitioner has requested extraordinary relief in the nature
of a writ of habeas corpus under the All Writs Act, 28 U.S.C. §
1651(a).  The Act authorizes "all courts established by Act of
Congress [to] issue all writs necessary or appropriate in aid of
their respective jurisdictions."  Petitioner challenges the
validity of the death sentence adjudged by a general court-
martial following his conviction of several offenses, including
premeditated murder.

On direct review, Petitioner's death sentence was affirmed
by the Army Court of Military Review (now designated as the Army
Court of Criminal Appeals), this Court, and the Supreme Court of
the United States.  United States v. Loving, 34 M.J. 956
(A.C.M.R. 1992), on reconsideration, 34 M.J. 1065 (A.C.M.R.
1992); United States v. Loving, 41 M.J. 213 (C.A.A.F. 1994);
Loving v. United States, 517 U.S. 748 (1996).  The decision of
the Supreme Court constitutes the final judgment as to the

2

legality proceedings on direct review.  See Article 71(c)(1), UCMJ.

Although legal review has been completed, the case is not yet final under Article 76, UCMJ, because the President has not acted on the death sentence.  See Article 71(a), UCMJ, ("that part of the sentence providing for death may not be executed until approved by the President").

During the period following the Supreme Court's decision, Petitioner has sought collateral review of his conviction.  See Loving v. United States, 62 M.J. 235, 238 (C.A.A.F. 2005) (summarizing the appellate history of the case on direct and collateral review).  Last year, we rejected Petitioner's request that we issue a writ of coram nobis to correct alleged errors in the proceedings.  Id. at 260.  After reviewing the relationship between the writs of coram nobis and habeas corpus, we observed that under applicable federal law, a writ of coram nobis could not provide a basis for relief if any other remedy remained available.  Id. at 253.  We concluded that because a writ of habeas corpus remained available for consideration by this Court under the All Writs Act, Petitioner could not "properly file a writ of coram nobis here."  Id. at 256.  We also declined to recharacterize Petitioner's coram nobis request as a habeas corpus petition, leaving the decision with Petitioner as to

3

whether a habeas corpus petition should be filed with our Court. Id. at 259.

Petitioner now has requested a writ of habeas corpus. He contends that he did not receive the effective assistance of counsel, as guaranteed by the Sixth Amendment to the Constitution, because his trial defense counsel failed to conduct a reasonable investigation into the reasonably available mitigating evidence. See Strickland, 466 U.S. at 690-91. Petitioner also contends that the President, in issuing rules for death penalty sentencing proceedings in the military: (1) exceeded his authority by promulgating aggravating factors in sentencing that should have been treated as functional elements of the crime during findings; and (2) failed to require that the court-martial panel find beyond a reasonable doubt during sentencing that any mitigating circumstances are outweighed by permissible aggravating factors. See Ring v. Arizona, 536 U.S. 584 (2002).

## II.  HABEAS CORPUS

During the period between final legal review under Article 71(a), UCMJ, and final action under Article 76, UCMJ, a servicemember is required to exhaust his or her remedies under the UCMJ before seeking collateral review in the Article III courts. See Clinton v. Goldsmith, 526 U.S. 529, 537 n.11

4

(1999). One of those remedies is a petition to this Court for a writ of habeas corpus under the All Writs Act. See Noyd v. Bond, 395 U.S. 683, 695 n.7 (1969); Loving, 62 M.J. at 248-51.

In the past, this Court has considered petitions requesting relief following completion of legal review under Article 71(a), UCMJ, but we have not expressly addressed the standards and procedures for reviewing such petitions under the All Writs Act. See, e.g., Garrett v. Lowe, 39 M.J. 293 (C.M.A. 1994). The All Writs Act "authorizes the employment of extraordinary writs . . . ." Clinton, 526 U.S. at 534. The All Writs Act, however, does not empower this Court "to act as a plenary administrator" of all judgments that we have affirmed. Id. at 536.

The standards and procedures for consideration of petitions during the period between final legal review under Article 71(a), UCMJ, and final action under Article 76, UCMJ, must ensure that relief is limited to circumstances warranting an extraordinary writ. As in the Article III courts, habeas corpus must be narrowly circumscribed by the standards and procedures applicable to collateral review. Otherwise, the writ could be used to routinely circumvent the time limitations on matters such as petitions for reconsideration (see C.A.A.F. R. 31) and petitions for new trials (see Article 73, UCMJ, 10 U.S.C. § 873 (2000)).

<u>Loving v. United States</u>, No. 06-8006/AR

Both Congress and the Article III courts have given a great deal of attention to limiting the availability of the habeas corpus writ for post-conviction review of civilian criminal cases.  <u>See, e.g.</u>, Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (amending 28 U.S.C. §§ 2251-55 (2000), and inserting 28 U.S.C. §§ 2261-66 (2000)); <u>Teague v. Lane</u>, 489 U.S. 288 (1989) (plurality opinion).  The core principles applied in Article III habeas proceedings provide a useful framework for our consideration of post-conviction habeas petitions in the military justice system under the All Writs Act.

We must exercise care, however, in borrowing from the standards and procedures developed for use in the Article III courts.  Many aspects of habeas corpus litigation in the Article III courts are not readily transferred to the court-martial process, particularly the federalism considerations applicable to collateral review of state court criminal proceedings.  Given the complex and dynamic nature of case law developments in the Article III courts, we should limit our adaptation to those standards and procedures necessary to decide the case before us.

A.  APPLICABLE STANDARDS FOR HABEAS REVIEW

1.  <u>Constitutional claims</u>

In a habeas review of a federal civilian conviction under 28 U.S.C. § 2255, the test for constitutional error is whether

6

"there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack."  In habeas review of state court convictions under 28 U.S.C. § 2254(d), the statute provides a two-tiered approach, with separate standards for questions of law and fact.  With respect to issues of law, the question is whether the challenged decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  With respect to factual determinations, the statute employs a presumption of correctness, asking whether the prior proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

At least one Article III court during collateral review of prior military justice proceedings has applied the § 2254(d) standards relevant to review of state court proceedings. Brosius v. Warden, 278 F.3d 239, 245 (3d Cir. 2002).  From the perspective of whether an extraordinary writ should be issued by our Court, we need not develop a unique standard.  In terms of restricting the scope of collateral review, the more detailed guidance in § 2254(d) is preferable to the broad language of § 2255.  Because we are not literally reviewing a state

7

proceeding, the § 2254(d) standard of factual review may be expressed as follows:  whether the prior proceeding resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the prior proceeding.

2.  Nonconstitutional federal claims

Habeas review of state court proceedings under 28 U.S.C. § 2254 typically involves constitutional claims.  See Richard H. Fallon, Jr., Daniel J. Meltzer & David L. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 1297 (5th ed. 2003).  As a result, § 2254 does not provide a useful model for review of habeas claims based upon nonconstitutional federal requirements.  Habeas review of federal civilian convictions is governed largely by the case law developed under the broad language of 28 U.S.C. § 2255.  Habeas review of military justice cases in the Article III courts takes place under 28 U.S.C. § 2241, under standards that vary widely among the circuits.  See United States ex rel. New v. Rumsfeld, 488 F.3d 403 (D.C. Cir. 2006).  Because the present case does not involve a nonconstitutional claim, we need not at this time select a specific standard for habeas review of nonconstitutional military justice issues under the All Writs Act.

### B.   PROCEDURAL CONCERNS IN HABEAS REVIEW

1.  Retroactivity of a new rule in a habeas claim

As noted in the lead opinion, a decision announcing a new rule of constitutional procedure applies to all cases pending on direct review.  Griffith v. Kentucky, 479 U.S. 314, 328 (1987). During collateral review of a final decision, however, there are different considerations.  In Teague, the Supreme Court limited the retroactive application of new constitutional law decisions during federal habeas review of state convictions, citing concerns about finality and efficiency.  489 U.S. at 309-10. The Supreme Court held that a "'habeas court need only apply the constitutional standards that prevailed at the time the original proceedings took place.'"  Id. at 306 (quoting Desist v. United States, 394 U.S. 244, 262-63 (1969)).

The Supreme Court identified two exceptions under which new rules could be given retroactive application during habeas review:  (1) where a new rule "places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe"; and (2) where a rule articulates fundamental procedures "without which the likelihood of an accurate conviction is severely diminished."  Id. at 311-13 (citation and quotation marks omitted).  In view of the importance of finality and efficiency in the military justice system, we should expressly state that the Teague principles

9

apply to habeas review of court-martial cases under the All
Writs Act.

## 2.  Procedural default of a habeas claim

When a case is subject to habeas review in the Article III
courts, failure to raise a claim during prior proceedings
normally constitutes a procedural default unless the petitioner
"can show cause for the default and prejudice resulting
therefrom."  Teague, 489 U.S. at 298; see United States v.
Frady, 456 U.S. 152, 167-68 (1982); Wainwright v. Sykes, 433
U.S. 72, 84 (1977).  With respect to a claim of ineffective
assistance of counsel, however, the Supreme Court in Massaro v.
United States, 538 U.S. 500 (2003), declined to invoke the
procedural default doctrine to preclude a petitioner from
raising that issue on habeas review when he had not raised it on
direct review.  Id. at 504.  Focusing primarily on the often
incomplete or inadequate development of the record for purposes
of resolving an ineffective counsel claim, the Supreme Court
stated that "in most cases" collateral review actually is
"preferable to direct appeal for deciding claims of ineffective
assistance of counsel."  Id. at 504.  In the present case, the
Government has not raised the defense of procedural default, so
we need not determine how the procedural default doctrine and
its various exceptions should apply in the context of a military
justice habeas case under the All Writs Act.  See 2 Randy Hertz

10

& James S. Liebman, Federal Habeas Corpus Practice and Procedure § 41.7b, at 1958-59 (5th ed. 2005).

3. Relationship of habeas claims to direct review

In the present case, Petitioner raised an issue of ineffective assistance of counsel on direct review.  Assuming for present purposes that the claim he made on direct review fairly includes the claims he makes in the pending habeas petition, we should assess the relationship between consideration of ineffective assistance on direct review and subsequent consideration upon habeas review under the All Writs Act.

The Supreme Court in Massaro expressly declined to address the impact of direct review of an ineffective assistance of counsel claim on a subsequent habeas petition, observing that "certain questions may arise in subsequent proceedings under § 2255 concerning the conclusiveness of determinations made on the ineffectiveassistance claims on direct appeal; but these matters of implementation are not before us."  538 U.S. at 508-09.  In the present case, the conclusiveness of our ineffective-assistance determinations on direct review is directly related to adequacy of the record and the absence of a hearing, matters that are considered in sections 4 and 5, infra.

4.  Development of the habeas record

In federal habeas review of a state conviction, a petitioner may obtain an evidentiary hearing, subject to a variety of limitations imposed by statute and case law concerning presumptions and deference to state court factfinding.  See 28 U.S.C. § 2254(d)-(e).  If a petitioner "failed to develop the factual basis of a claim in State court proceedings," the federal habeas court may not grant a hearing unless:

> (A) the claim relies on --
>
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2)(A)-(B).

The term "failed to develop," however, does not apply unless the failure to develop facts in the prior proceeding is attributable to the petitioner.  See Williams v. Taylor, 529 U.S. 420 (2000).  For example, if a state has not held an evidentiary hearing, a petitioner has not "failed to develop"

12

the factual basis for the claim, and the court determines whether a hearing is necessary under the standards applicable to a procedural default.  See Bryan v. Mullin, 335 F.3d 1207 (10th Cir. 2003).  When a petitioner alleges grounds that would warrant issuance of a writ, facts are in dispute, and the state has not provided a full and fair hearing to resolve the factual matter, the federal court will provide a habeas hearing.  See, e.g., Bell v. True, 413 F. Supp. 2d 657, 699 (W.D. Va. 2006); King v. Bell, 392 F. Supp. 2d 964, 974 (M.D. Tenn. 2005).

In habeas review of federal convictions under § 2255, the opportunity to obtain a federal hearing is broader.  The habeas court will hold a hearing to make findings of fact and conclusions of law "[u]nless the motions and the files and the records in the case conclusively show that the prisoner is entitled to no relief . . . ."  Although issues of comity and federalism account for the difference between the standards applicable for review of state and federal convictions, the underlying result is the same -- development of a record, either on direct review or during collateral review, that provides a foundation for evaluating the habeas claim.

The military justice system does not have standing trial courts.  See Articles 22 and 23, UCMJ, 10 U.S.C. §§ 822, 823 (2000) (designating officials authorized to "convene" general and special courts-martial).  Once the convening authority has

acted on a case, there is no trial-level forum available to consider post-conviction matters reviewed by trial courts in civilian cases, such as ineffective assistance of counsel. See DuBay, 17 C.M.A. at 149 n.2, 37 C.M.R. at 413 n.2 ("Normally, collateral issues of this type would, on remand in the civil courts, be settled in a hearing before the trial judge. The court-martial structure, under the Uniform Code of Military Justice, however, is such that this cannot be accomplished.").

In the military justice system, issues such as ineffective assistance of counsel may be raised during direct appeal, and the appellate court determines whether to order a factfinding hearing using the procedure established in DuBay. Id.; see United States v. Campbell, 57 M.J. 134, 138 (C.A.A.F. 2002). In such cases, we resolve the question of whether a factfinding hearing is necessary by applying standards similar to those employed in the Article III courts in the course of deciding whether a factfinding hearing is necessary on collateral review. See United States v. Ginn, 47 M.J. 236, 248 (C.A.A.F. 1997).

At the time of our direct review of Petitioner's case, we applied a standard that arguably provided appellants with an even broader opportunity to obtain a post-conviction hearing. See, e.g., United States v. Wean, 37 M.J. 286, 2888 (C.M.A. 1993) (requiring a DuBay hearing or additional affidavits when defense counsel affidavits were "inadequate or nonresponsive");

14

United States v. Perez, 18 C.M.A. 24, 26, 39 C.M.R. 24, 26 (1968) (stating that a hearing is required to resolve conflicting affidavits if "the evidence before us does not so compellingly demonstrate [the] accuracy of recollection by one as opposed to the other . . . as to justify determination of the issue on the basis of the affidavits").

5.  Habeas review of Sixth Amendment claims in the absence of a hearing during direct review

As discussed earlier, the Supreme Court in Massaro identified a number of problems associated with reliance on direct appeal to resolve ineffective counsel claims, focusing primarily on the difficulty of ascertaining the pertinent facts: "When an ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record not developed precisely for the objective of litigating or preserving the claim and thus often incomplete or inadequate for this purpose."  538 U.S. at 504-05.  With respect to the constitutional standard, the Supreme Court noted:

> Under Strickland v. Washington, 466 U.S. 668 (1984), a defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial.  The evidence introduced at trial, however, will be devoted to issues of guilt or innocence, and the resulting record in many cases will not disclose the facts necessary to decide either prong of the Strickland analysis.

15

Id. at 505.  The Supreme Court emphasized that further

proceedings were needed not only to ascertain the facts, but

also to place the facts in the proper context:

> If the alleged error is one of commission, the
> record may reflect the action taken by counsel
> but not the reasons for it.  The appellate court
> may have no way of knowing whether a seemingly
> unusual or misguided action by counsel had a
> sound strategic motive or was taken because the
> counsel's alternatives were even worse.  The
> trial record may contain no evidence of alleged
> errors of omission, much less of the reasons
> underlying them.  And evidence of alleged
> conflicts of interest might be found only in
> attorney-client correspondence or other documents
> that, in the typical criminal trial, are not
> introduced.

Id. (citation omitted).

The Supreme Court specifically linked the issue of factual

development to the second prong of Strickland:  "Without

additional factual development, moreover, an appellate court may

not be able to ascertain whether the alleged error was

prejudicial."  Id.  In the course of discussing the procedure,

the Supreme Court highlighted the critical role of a hearing on

the issue of ineffective assistance:

> The court may take testimony from witnesses for
> the defendant and the prosecution and from the
> counsel alleged to have rendered the deficient
> performance.  See, e.g., Griffin, supra, at 1109
> (In a § 2255 proceeding, the defendant "has a
> full opportunity to prove facts establishing
> ineffectiveness of counsel, the government has a
> full opportunity to present evidence to the
> contrary, the district court hears spoken words
> we can only see in print and sees expressions we

16

>     will never see, and a factual record bearing
>     precisely on the issue is created[.]").

Id. at 505-06.

As noted in section II.B.3., supra, the Supreme Court left open in Massaro the question of whether consideration of a Sixth Amendment claim on direct review of a federal conviction precluded habeas review of the same matter. There is nothing in the Supreme Court's decision, however, that suggests that it would be appropriate to preclude habeas review in a case where a petitioner, during direct review, did not have an adequate opportunity to develop the factual basis for a post-conviction Sixth Amendment claim under Strickland. On the contrary, in view of the Supreme Court's emphasis on the importance of factfinding, it would be inappropriate to preclude habeas review of a Strickland claim previously considered on direct review unless a petitioner had a full and fair opportunity to have a court address factual matters during direct review.

This Court has no factfinding powers. See Article 67(c), UCMJ, 10 U.S.C. § 867(c) (2000). Accordingly, we can only afford an opportunity for factual resolution on direct appeal by applying the standards in Ginn to determine whether an appellant has presented a Strickland claim requiring a DuBay hearing. If an appellant has made such submission on direct review, and we

have not ordered a DuBay hearing, then the appellant has not received a full and fair hearing on the Strickland issue.

### III. APPLICATION OF HABEAS CORPUS PRINCIPLES

### A. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

In evaluating Petitioner's claim of ineffective assistance of counsel in failing to conduct a reasonable investigation into reasonably available mitigating evidence under the standards and procedures identified in part II, supra, we look to determine whether defense counsel's decisions as to this investigation were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  That "clearly established Federal law" is found in Strickland, 466 U.S. at 490.

The Strickland Court articulated a two-pronged test for determining the claimed ineffectiveness of defense counsel's representation.  First, in light of the facts and all the circumstances of the particular case, and when viewed at the time of counsel's conduct, were the complained-of acts or omissions outside the wide range of professionally competent assistance?  Id. at 690.  That is, did the performance fall "below an objective standard of reasonableness" measured "under prevailing professional norms"?  Id. at 688.  Second, is there a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different -- a probability sufficient to undermine confidence in the outcome? Id. at 694. Pertinent to the petition now before us, the Supreme Court stated:

> These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case. As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Id. at 690-91.

Petitioner argues that, in evaluating the reasonableness of his defense counsel's investigation, we ought to apply retroactively what he considers to be a "new rule" found in the Supreme Court's intervening decision in Wiggins v. Smith, 539 U.S. 510 (2003). There, the Supreme Court found ineffective representation by a defense counsel in a capital case who failed to pursue leads and to expand the mitigation investigation into the defendant's traumatic life history. Id. at 519-34.

19

Apart from whether retroactive application would be appropriate under the standards discussed in section II.B.1., supra, there is no basis upon which to conclude that the decision in Wiggins represents a "new rule." After discussing its earlier decision in Williams v. Taylor, 529 U.S. 362 (2000), and referring to that opinion as "illustrative of the proper application of [the Strickland] standards," the Wiggins Court said of its decision in Williams: "In highlighting counsel's duty to investigate, . . . we applied the same 'clearly established' precedent of Strickland we apply today." Wiggins, 539 U.S. at 522. Accordingly, recognizing that both Williams and Wiggins serve only to illustrate the appropriate application of Strickland's standard to claims of inadequate investigation, they do not represent a "new rule" for purposes of retroactive application. As such, we should reject Petitioner's reliance on Wiggins as the basis for relief or as a vehicle for retroactively applying any new legal concepts during collateral review of Petitioner's Sixth Amendment claims. See Smith v. Dretke, 422 F.3d 269, 279 (5th Cir. 2005). Applying the limitations on retroactivity that govern habeas proceedings, Strickland, not Wiggins, provides the appropriate yardstick for assessing whether the writ should issue. Cases such as Wiggins and Williams may be pertinent to the extent that they illustrate

20

a proper Strickland analysis, but they cannot be used to substitute for or expand the scope of Strickland.

We apply the habeas framework to Petitioner's claims of ineffective assistance of counsel by determining, first, whether Petitioner has received a full and fair hearing of these claims. If he did not receive such a hearing, we then must consider whether there was an appropriate determination during direct review that no hearing was required into those claims. If a hearing into the factual basis for Petitioner's claims was required, Petitioner now is entitled to a full and fair hearing of those claims.

During the sentencing proceeding at trial, defense counsel presented testimony from members of Petitioner's family, individuals from the community in which he was raised, officials from the detention facility, and a fellow servicemember. The sentencing testimony addressed the negative environment in Petitioner's family, violence in the community during his formative years, and other mitigating factors. As noted in the lead opinion, appellate defense counsel have submitted post-trial affidavits from members of Petitioner's family and others containing substantial details not presented at trial. These affidavits paint a much more graphic picture of Petitioner's background than the testimony presented at trial, including detailed information concerning Petitioner's childhood alcohol

21

and drug abuse, the systematic physical violence family members inflicted on Petitioner, family rejection of Petitioner, including knowledge that his mother wanted to preclude his birth through an abortion, and violence in the community directed at the family in general and Petitioner in particular, including the use of firearms against Petitioner.

At trial, the prosecution's closing argument on sentencing emphasized that the defense had presented little information that would connect the home and community environment to any effect on Petitioner. The detailed information reflected in the affidavits of potential witnesses submitted on appeal, if sufficiently reliable for presentation at trial, might well have provided the necessary link.

This Court does not have factfinding powers. As a result, we were not in a position during direct review of Petitioner's conviction to evaluate appellate defense counsel's contention that the information was both reliable and outcome determinative. Likewise, without factfinding powers, we were not in a position during direct review to evaluate the Government's contention that the affidavits from defense counsel provided a conclusive basis for determining that counsel were not ineffective; nor were we in a position to determine that the information in the affidavits from others would not have had a significant effect during the sentencing process.

Given the important mixed questions of fact and law raised by the post-trial affidavits, a hearing should have been ordered on direct review under the then-current standards set forth in Wean and Perez. See section II.B.4., supra. Moreover, as set forth in the lead opinion, a hearing is required at the present time under Ginn.

During habeas hearings at both the state and federal level, factfinding courts evaluate the reliability and impact of the type of information submitted by appellate defense counsel in the present case. In the military justice system, a similar evaluation may be made in a DuBay hearing that receives testimony from potential witnesses as to what they would say at trial and from defense counsel concerning both their investigation and trial strategies. Such a hearing can identify: (1) the specific sources of mitigation or rebuttal information omitted or incompletely presented at trial; (2) whether such omitted or incomplete sources of information should have been identified in an investigation by or under the direction of a competent attorney under Strickland; (3) whether such information, if properly investigated, would have provided a significant addition to the information available for presentation at trial; (4) whether the availability of such information reasonably could have led counsel to change trial tactics in specific respects; (5) whether any such change in

trial tactics might have had an impact on the trial outcome; and (6) whether, in light of such impact, any deficiency of counsel resulted in prejudicial error under Strickland.  The questions set forth in the lead opinion provide the appropriate framework for a hearing on these issues.

### B.   THE RING CLAIM

Under the standards set forth in section II.B.1., supra, I agree with the lead opinion that Petitioner is not entitled to relief under Ring v. Arizona, 536 U.S. 584 (2002).  See Schriro v. Summerlin, 542 U.S. 348 (2004).

CRAWFORD, Judge (dissenting):

I respectfully dissent from the action of the majority ordering a hearing in this case under United States v. DuBay, 17 C.M.A. 147, 37 C.M.R. 411 (1967), because, in so doing, the majority ignores both the facts that have already been "salted down" in the record of trial as well as this Court's previous review of those facts. Neither the facts nor the legal standards applicable to the facts have changed since this Court, on direct appeal in 1994, thoroughly reviewed Petitioner's allegations of ineffectiveness of counsel under the standards set forth in Strickland v. Washington, 466 U.S. 668 (1984). Wiggins v. Smith, 539 U.S. 510 (2003), did not change the Strickland standard, and in any event, Wiggins is clearly distinguishable from this case. Just as they were in 1994, the facts are present in the record of trial[1] without resorting to a DuBay hearing to decide the Strickland issue. I must then ask the question, what other than the personnel at this Court, has changed since 1994?

---

[1] The affidavits submitted by Petitioner's family members with details regarding Petitioner's childhood were admitted by this Court as appellate exhibits on April 23, 1993. United States v. Loving, 38 M.J. 178 (C.M.A. 1993). The original opinion in this case was decided on November 10, 1994. United States v. Loving, 41 M.J. 213 (C.A.A.F. 1994). Petitioner's three defense counsel provided affidavits in March 1992 in response to an order of the Army Court of Military Review. Affidavit of JDS, dated March 4, 1992; Affidavit of WHI, dated March 2, 1992; Affidavit of DLH, dated March 3, 1992.

## I.  STANDARD OF REVIEW

If a petitioner was given full and fair consideration to each of his claims on a standard that has remained unchanged, the petitioner is not entitled further review of the same issue. "[W]hen a military decision has dealt fully and fairly with an allegation raised in that application, it is not open to a federal civil court to grant the writ simply to re-evaluate the evidence."  Burns v. Wilson, 346 U.S. 137, 142 (1953) (citation omitted).  In this case, counsel had every reasonable condition and tool to raise the issue of effectiveness of counsel during the action by the convening authority.  Such motion raised to the convening authority then would be "ruled upon by the same . . . judge who presided at trial."  Massaro v. United States, 538 U.S. 504, 506 (2003).  That "judge, having observed the earlier trial, should have an advantageous prospective for determining the effectiveness of counsel's conduct and whether any deficiencies were prejudicial."  Id.  After that stage, counsel representing Petitioner, the same counsel present on this appeal, years later[2] was not hesitant to raise issues concerning the performance of trial defense counsel and presents no evidence of being in "an awkward position in vis-a-vis trial

---

[2] Compare the one-year time limitation under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2244(d)(1)(2000), and the two-year new trial time limitation in the military.  Rule for Courts-Martial (R.C.M.) 1210.

[defense] counsel." Id.[3] Thus, Petitioner's counsel could be assured the facts, on a common issue -- not a novel issue, were correctly found and applied during our direct review of this case.[4] We should not repeat the process we have already carefully performed by reviewing this issue again. This Court's prior decision is and should be considered final.

Federal statutes also limit other circuit courts' review of habeas corpus claims where the same issue was litigated on direct appeal. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d)(2000), which is persuasive authority, provides that a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in the state court proceedings unless the adjudication of the claim resulted in a decision that was: (1) contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court; or (2) based on an unreasonable

---

[3] In the military justice system, one of the most frequently litigated issues is the effectiveness of counsel. Francis A. Gilligan & Fredric I. Lederer, Court-Martial Procedure § 5-55.00, at 201-13 (2d ed. 1999 & 2004 Supp.) and cases cited therein.

[4] Appellate defense counsel raised numerous appellate issues in Loving, 41 M.J. at 227. One of the issues raised was the effectiveness of counsel. Id. at 299. "As they did before the court below, they have not identified in what particulars the investigation was inadequate or what additional issues should have been raised." Id.

determination of the facts in light of the evidence presented at the state court proceeding. The "unreasonable application" prong permits a federal habeas corpus court to grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of a petitioner's case.

This Court, on direct appeal, adjudicated Petitioner's claim that his trial defense counsel were ineffective for failing reasonably to investigate his background for mitigation evidence. In evaluating that claim, we applied the standard established in Strickland, the same standard applied in Wiggins and the same standard applied to such claims today. In accordance with 28 U.S.C. § 2254(d), habeas review of this issue is barred unless this Court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . [or] . . . was based on an unreasonable determination of the facts in light of the evidence presented in the [original] proceeding." 28 U.S.C. § 2254(d)(1) and (2). Since this Court reviewed the issue of ineffective assistance of counsel,[5] including the "reasonableness" of trial defense

---

[5] The majority relies on essentially the same post-trial affidavits and documents it had before it on the direct appeal to now conclude that it did not review the "reasonableness" of the investigation by defense counsel.

counsel's investigation on direct review and applied the appropriate standard set out in Strickland, AEDPA bars further review of this issue.

In addition, the law of the case doctrine and the doctrine of finality preclude review of the issues raised by Petitioner. To allow unlimited extraordinary writs would be an abuse of discretion. "The interest in finality of judgments dictates that the standard for a successful collateral attack on a conviction be more stringent than the standard applicable on a direct appeal." United States v. Stoneman, 870 F.2d 102, 103 (3d Cir. 1989). This case demonstrates the need for finality.

## II. THE ISSUE AND FACTS REGARDING THE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM WERE ADDRESSED ON DIRECT APPEAL.

The majority concludes that "in light of" Wiggins, it does "not have the factual predicate to determine if our prior decision addressing the issue of ineffective assistance of counsel is correct." The majority, however, notes that Wiggins "applied the 'clearly established' precedent of Strickland v. Washington" and then cites Wiggins, citing Strickland, for the proposition that "defense counsel has a fundamental duty to perform a reasonable investigation."

5

Wiggins cites Strickland throughout the opinion and never establishes any new rules.[6] Wiggins is a fact-based decision and did not change the law with regard to evaluating ineffective assistance of counsel claims. Those courts which have addressed or applied Wiggins have recognized this and have distinguished Wiggins.[7] The majority, however, attempts to make something out of Wiggins which was never intended by the Supreme Court.

---

[6] The majority opinion describes Wiggins as clarifying and illuminating "the standards for a reasonable investigation in a criminal trial, in general, and in a death penalty case, in particular."

[7] See McHone v. Polk, 392 F.3d 691, 710 (4th Cir. 2004):

> Accordingly, we hold that where, as here, counsel has investigated and presented mitigating evidence pertaining to petitioner's childhood and that the jury has credited such evidence and nonetheless imposed the death penalty, that counsel's decision not to investigate further, particularly where such investigation would bear little -- if any -- fruit, cannot support a Strickland claim.

Johnson v. Bell, 344 F.3d 567, 574 (6th Cir. 2003) (Court held that the testimony of petitioner's family during mitigation sentencing would not have held up to the quantum of evidence necessary to pass the second "prejudice" prong of Strickland because the court did not see how this testimony would have created a reasonable probability that the jury would have found against the death penalty had they heard this testimony.); Wilson v. Ozmint, 352 F.3d 847, 866 (4th Cir. 2003) (Unlike in Wiggins, the appellant's counsel made the decision to not present additional mitigation evidence after a thorough investigation.); Coble v. Dretke, 444 F.3d 345, 356 (5th Cir. 2006) ("Unlike in Wiggins, Coble's attorneys not only investigated his background, they also offered a mitigation case."); Marshall v. Hendricks, 313 F. Supp. 2d 423, 440 (D.N.J. 2004) ("Although several Supreme Court decisions have applied Strickland to ineffective assistance of counsel claims at the sentencing phase of a capital trial, all are factually distinguishable from the present case."); Bucklew v. Luebbers,

Wiggins addresses a state court's misapplication of the Strickland standard. 539 U.S. at 551. It did not modify the Supreme Court's interpretation of Strickland. In this case, the majority is now holding that this Court "did not focus on the investigative aspects leading to defense counsel's tactical decision in sentencing" when reviewing the case on direct appeal, even though this Court found that defense counsel "made reasonable tactical decisions related to the sentencing proceeding." I believe that on direct appeal, this Court did evaluate the reasonableness of the defense counsel's investigation. The evidence necessary to make such evaluation was before this Court at the time in the record itself, as well as in the numerous affidavits submitted as appellate exhibits from the three trial defense counsel.[8] The affidavits and documents that the majority relies on to conclude there was "powerful mitigating evidence" which was not investigated were before this Court on direct appeal, including the testimony of the family members and acquaintances at trial.[9]

---

436 F.3d 1010, 1014 n.3 (8th Cir. 2006) (Court agreed with district court's interpretation that Wiggins did not establish a "supervening precedent but demonstrate[d] specific applications of Strickland to particular fact situations.").

[8] Affidavit by JDS dated March 4, 1992; Affidavits by WHI dated March 2 1992, February 22, 1993, February 23, 1993, respectively; Affidavits by DLH dated March 3 1992, February 7, 1993, respectively.

[9] The family's affidavits were admitted by the Court on April 23, 1993, as Appellate Exhibits. 38 M.J. 178-79 (C.M.A. 1993).

III.  EXAMINING THE FACTS UNDER STRICKLAND AND WIGGINS

These facts were "salted" away in the record of trial, and the appellate exhibits reveal what actions were taken and the thought processes of trial defense counsel in this case.  The record shows the numerous witnesses and evidentiary exhibits that were presented by the defense during the sentencing hearing and significantly, what evidence trial defense counsel and their forensic psychiatrist evaluated, considered, and discussed among themselves and with Petitioner before deciding on a strategy and what evidence actually to present and not present on the merits and during sentencing.

Investigation of Petitioner's Background

In this case, trial defense counsel visited Petitioner's hometown.[10]  They interviewed family members, teachers, friends, acquaintances, and reviewed school records.  They interviewed members of Petitioner's unit and Petitioner.  Trial defense counsel did conduct an investigation and then ultimately presented testimony and documents that this investigation yielded at trial.[11]

---

[10] In Wiggins, the defense counsel relied on a report to evaluate the Wiggins's background and determine whether to investigate any further.  539 U.S. at 524.  In this case, trial defense counsel visited and interviewed a number of individuals from Petitioner's hometown, family, school, background, and unit. The defense presented numerous witnesses and documents at trial. Petitioner's counsel did investigate his case.

[11] According to their affidavits, trial defense counsel:

Investigation of Petitioner's Physiological and
Psychological Background

The defense considered and inquired about potential physiological reasons, such as a prior head injury or brain abnormality, to explain or mitigate Petitioner's actions. The defense had at their disposal a sanity board and a forensic psychiatrist. Dr. David Armitage is a forensic psychiatrist who holds professional degrees in medicine and law.[12] He was the Associate Chairman for Forensic Science and Litigation Support, Department of Legal Medicine, Armed Forces Institute of Pathology, Washington, D.C., and Consultant Emeritus to the Surgeon General of the Army on Forensic Psychiatry. Loving, 41 M.J. at 240. He was part of the defense team and thus his tests, evaluations, and advice were covered and protected by the attorney-client privilege.

In their affidavits, trial defense counsel discussed Dr. Armitage's extensive involvement and participation in the

---

did extensive investigation of Private Loving's past, from birth through the date of the offenses. Major [H] spent approximately a week in Private Loving's home town speaking with his family, his . . . teachers, his neighbors, religious leaders who knew him and the coaches who worked with him. We interviewed dozens of people in Private Loving's unit and numerous friends and acquaintances. We had long discussions with Private Loving himself.

[12] Wiggins's attorney did not utilize the services of a forensic psychiatrist or request additional psychological testing as was conducted in Petitioner's case.

9

preparation and trial of this case.  Dr. Armitage met

"extensively with Private Loving, and [trial defense counsel]

obtained all the psychological and medical testing Dr. Armitage

needed to provide the [defense] a proper evaluation of the case

from his perspective."[13]

Investigation of Petitioner's Alcohol and Drug Use

The defense also considered whether to present a partial

mental responsibility defense or diminished capacity defense

based on alcohol and drug intoxication.  The defense was aware

of Petitioner's history of drug and alcohol use, to include his

claim of ingesting alcohol, cocaine, and marijuana or hashish

before and during the crime spree.  Considering the

circumstances surrounding the two robberies, the two

murder/robberies, and the attempted murder/robbery, as well as

Petitioner's detailed recall of the events without remorse to

law enforcement shortly after the crimes, attempts to show

Petitioner was drunk or drugged or his actions were the result

---

[13] Unlike in Wiggins, Petitioner was interviewed extensively by Dr. Armitage and other tests and evaluations Dr. Armitage thought were appropriate were conducted.  Dr. Armitage participated in evaluating not only the psychiatric evidence present in the case, but also assisted trial defense counsel in evaluating the evidence in the entire case, as well as how certain presentations or strategies would be more favorably received by the court members.  Dr. Armitage even prepared personality profiles of the court members for trial defense counsel to assist in this assessment.

10

of some kind of diminished capacity were not feasible and fraught with potential risk.

Trial defense counsel and Dr. Armitage weighed, reviewed, and evaluated the results of all psychological and medical testing conducted on Petitioner with the evidence of his intoxication at the time of the crime spree. Concluding that the evidence would have to come in through the testimony of Petitioner, the defense team then considered whether that strategy would be the best one for this case. Based on their own experiences and consultations with their expert and other experienced counsel, their observations of Petitioner's inability to present himself well as a witness, as well as the Government's ability to counter any expert testimony with evidence that Petitioner had sociopathic personality traits,[14] trial defense counsel decided that course of action would not be the most beneficial.

### Strategy Decisions: Avoid Opening the Door to Evidence of a Sociopathic Personality

In Petitioner's case, the members heard an extensive amount of evidence about his difficult life, the problems with his

---

[14] The defense was concerned that the Government would be able to counter any intoxication defense by pointing out the details of the crimes themselves, and Petitioner's ability to recall the intricate details as well as his thought processes during the crimes to law enforcement personnel without the prompting or intensive questioning that usually accompany an interview of a suspect.

family and school, his problems with alcohol and drugs, that he was a victim of and exposed to violence, and that he was obsessive of his manipulative girlfriend.  Trial defense counsel, in conjunction with Dr. Armitage, conducted an extensive investigation of Petitioner, his family, friends, acquaintances, teachers, and work associates.  They thought about the potential issues or defenses and what kind of evidence would support those theories.  After they performed their investigation, they carefully reviewed what they had and then made an informed decision, in consultation with Petitioner, on what course of action would be best to save Petitioner from a death sentence.

There is no indication in this case from the numerous affidavits and records presented by appellate counsel that further investigation by trial defense counsel at the time of the trial would have revealed any other potential defenses or minimized aggravating factors in Petitioner's background. Significantly, at the same time defense counsel were trying to present a particular picture of Petitioner, trial defense counsel were cautious and cognizant of doing what was necessary to avoid opening the door to evidence that would show Petitioner had a propensity to repeat this type of misconduct in the future.  This evidence would have guaranteed a death sentence. Also, unlike in Wiggins, Petitioner's defense counsel did

12

present an extensive mitigation case during the merits of the case, as well as during the sentencing phase, in an attempt to convince the members that Petitioner would not be a further threat to society if confined and that confinement for life was appropriate over a sentence to death.

In this case, Petitioner had been exposed to, and was involved in, violent behavior.[15]  In addition, Dr. Armitage believed Petitioner had a sociopathic personality and would commit this type of misconduct in the future.  If Dr. Armitage testified, he would be subject to interview and cross-examination by the Government.  There was a real potential that the Government could present very damaging evidence that would further support the death sentence.

Although the defense strategy was not to rely on a diminished capacity defense based on alcohol or drug intoxication, the defense attempted to solicit evidence of Petitioner's intoxication on the night of the murders from his girlfriend.  However, the only way the defense could actually get this evidence before the members was by having Petitioner testify.  The defense team, after consulting with Dr. Armitage,

---

[15] According to a Sanity Board Report and affidavits, Petitioner sexually assaulted his ten-year-old female niece when he was around sixteen years of age.  He acknowledged engaging in sexual molestation of other young girls but did not provide any details.  Petitioner also acknowledged involvement in petty crimes and drug abuse as well as fighting.

and having had the opportunity to observe Petitioner's demeanor, decided that Petitioner "would likely become angry when cross-examined and exhibit a personality more representative of a homicidal maniac than a confused, misunderstood, desperate and disadvantaged youth."  Trial defense counsel believed that if Petitioner testified, he "might laugh or otherwise react inappropriately to a sensitive subject as [they] had seen him do on a number of occasions."  The defense made a cognitive decision that this was not the strategy they were pursuing. Trial defense counsel concluded that establishing that Petitioner was using alcohol and drugs -- in particular cocaine -- to give him courage to commit such heinous crimes, was not the best strategy in front of a military jury.[16]

Contrary to assertions by appellate defense counsel and claims made in defense appellate exhibits at the time of the trial, there was no indication that family, friends or acquaintances from Petitioner's hometown and prior life were hesitant to talk to or cooperate with Petitioner's counsel. Appellate defense counsel's claim that it was Petitioner's

---

[16] Defense counsel concluded that Petitioner was unable to testify effectively in his own defense.  "Despite extensive work with Dr. Armitage, and a number of sample direct and cross examination exercises conducted by the defense team, Private Loving usually did himself more harm than good on these 'test runs.' . . .  [He had] a tendency to smile when giving answers concerning the killings."  He also was "easily led and easily frustrated."

family members who were reluctant to be forthcoming with defense counsel is inconsistent with the fact that these witnesses did testify at trial and apparently cooperated with trial defense counsel in providing information about Petitioner.

Trial defense counsel sought out evidence of whether Petitioner's girlfriend was involved in drug dealing and the murders and robberies. It was the friends of Petitioner's girlfriend whom trial defense counsel thought were reluctant to speak with them. Trial defense counsel felt the friends were reluctant to talk based on the actions or conversation they may have had with a local Texas Ranger. Trial defense counsel had no evidence of any specific conversations or actions by the Texas Ranger but had "an impression" he may have said something to cause them to be less than forthcoming about Petitioner's girlfriend.

## Summary of the Wiggins Application

Applying the Strickland standard, the Supreme Court in Wiggins held that the petitioner's claim of ineffective assistance of counsel should not be evaluated by examining whether counsel should have presented a mitigation case, but whether the investigation supporting their decision not to introduce mitigating evidence of Petitioner's background was itself reasonable. 539 U.S. at 533. Thus, this Court should conduct an objective review of the trial defense counsel's

performance, measured for reasonableness under prevailing professional norms, including a context-dependent consideration of the challenged conduct as seen from trial defense counsel's perspective at the time of that conduct.

In Wiggins, trial defense counsel did not expand their investigation beyond the presentence investigation report and the Social Services records. Id. at 524. The Supreme Court found that this lack of action fell short of the professional standards prevailing in Maryland in 1989. Id. The Supreme Court concluded that information in those reports should have prompted counsel to pursue leads that would have allowed the counsel to make an informed choice as to possible defenses. Id. at 525. In Wiggins, trial defense counsel did not present much of a mitigation case. See id. at 526. And, apparently there were no aggravating factors in Wiggins's background and trial defense counsel did not discover any evidence to suggest that a mitigation case would have been counterproductive or that further investigation would have been fruitless. Id. at 535. Petitioner's situation was much different than Wiggins's situation.

In Petitioner's case, trial defense counsel did not stop or rely on a "presentence report" to evaluate what sentencing evidence may or may not exist. First, trial defense counsel had on the defense team, Dr. Armitage, a premier forensic

16

psychiatrist who talked to and evaluated Petitioner personally and reviewed previous mental health evaluations.  The defense team did pursue with Dr. Armitage potential evidence of psychiatric or psychological evidence.  Unfortunately, the evidence did not exist with regard to Petitioner.  Second, trial defense counsel visited and interviewed Petitioner's family and acquaintances in Petitioner's hometown to determine what, if any, mitigating or extenuation evidence may exist.  Many of Petitioner's family members, as well as childhood mentors, testified either in person or via stipulation to show that Petitioner was a "confused, misunderstood, desperate and disadvantage youth."  In addition, the defense presented testimony from the noncommissioned officers from the confinement facility to show Petitioner had been a good worker while in pretrial custody and had adjusted to confinement.  Trial defense counsel were also able to obtain from cross-examination of the Petitioner's battery commander that Petitioner responded well to leadership and was doing well until his involvement with his girlfriend.

Rather than taking the "shot gun" approach, trial defense counsel, after thorough consideration, decided that their strategy would be to focus on demonstrating a connection between Petitioner's current misconduct and his past problems, his upbringing, his exposure to violence, lack of good leadership in

his family environment, the fact that he has a tendency to be led, and that he had an obsession with his girlfriend who the defense attempted to portray as a manipulative user.[17]  While the defense attempted to demonstrate a nexus between Petitioner's past[18] and his misconduct, they also wanted to demonstrate that Petitioner could function and conform his actions in an environment of strong leadership to include confinement.  The defense strategy was to present an extenuating and mitigating case on the merits and on sentencing.  The defense's end game was to avoid the death sentence and convince the panel members that confinement for life was a more appropriate punishment. The defense used everything at their disposal -- witnesses, documentary evidence, voir dire, and argument -- to portray their theory and to avoid opening the door for damaging evidence the Government could potentially use to counter their theory.

---

[17] To support the theory that Petitioner's girlfriend was the source of his misconduct, the defense presented evidence that Petitioner was a "naive, immature, individual who could be easily manipulated."  They presented members from Petitioner's unit to talk about the effect the girlfriend had on Petitioner.
[18] Specifically, part of the defense strategy was to essentially show that "a poor upbringing created an enhanced risk" of misconduct.  In order to do this, the defense:

> presented evidence about the violence in Private
> Loving's neighborhood, the poor quality of his family
> (particularly his father), and the poor conditions at
> his school. . . . how his father was a burned out
> alcoholic with a long criminal record and put on
> Private Loving's older brother and mentor, a man with
> a violent past.

The facts in the case demonstrate that trial defense counsel, in conjunction with their forensic psychiatrist, clearly conducted a "reasonable" investigation of Petitioner, his family, his upbringing, his drug and alcohol use, and any potential defenses before deciding on a strategy for presenting a defense and a basis for the members to adjudge a life sentence versus a sentence to death. Trial defense counsel did not abandon their investigation at an unreasonable juncture. They looked at everything that was available to them at that point in time. They considered it. They even discussed the strategy with their client. They made decisions based on their experience as to what they thought would be the best course of action to preclude the members from adjudging a sentence of death. We cannot -- and should not -- evaluate trial defense counsel's strategic choices solely based on the members' final decision.

## IV.   AGGRAVATING NATURE OF PETITIONER'S CRIMES
### WAS THERE PREJUDICE?

Defense counsel are presumed competent and the burden to prove there is a constitutional violation is on the petitioner. United States v. Cronic, 466 U.S. 648, 658 (1948). "An ineffective assistance claim has two components:  A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." Wiggins, 539 U.S. at 521

(citing Strickland, 466 U.S. at 687).  Performance is deficient
if it falls below "an objective standard of reasonableness,"
which is defined in terms of prevailing professional norms.
Strickland, 466 U.S. at 688.

To establish prejudice, a petitioner must show there is a
reasonable probability that, but for counsel's unprofessional
errors, the proceeding's result would have been different.  Id.
at 694.  This Court should assess prejudice by reweighing the
aggravating evidence against the totality of the mitigating
evidence adduced both at trial and in the habeas proceedings.
Williams v. Taylor, 529 U.S. 362, 397-98 (2000).

The manner and circumstances surrounding the murders in
this case were heinous and egregious.  Not only did Petitioner
commit the murders which subjected him to the possibility of a
death sentence, but he also committed three other serious crimes
close in time to the murders.  And, one of those crimes would
likely have been a third murder if Petitioner had successfully
fired the weapon into the head of the third taxi driver.
Petitioner's statement indicates it was his intent to shoot and
kill the third taxi driver.  Any additional testimony by family
members or other individuals or evidence from further
psychological or physiological testing would not have not have
held up to the quantum of evidence necessary to pass the second
"prejudice" prong of Strickland.  It is difficult to see how

20

this testimony would have created a reasonable probability that the members would have found against the death penalty had they heard any of the additional evidence as posited by appellate defense counsel.  Compare Johnson, 344 F.3d at 571 (court could not say that the additional testimony of family members would have led to a different result and, in addition, the testimony would have opened the door to rebuttal evidence which would have undercut the image the defense would have tried to portray with that evidence).

The court members viewed a videotape made during an interview of Petitioner by the Army Criminal Investigation Command the day after the murders and attempted murder of the taxi cab drivers.  The members observed Petitioner describe in excruciating detail, without prompting or extensive questioning by the agent, his acts of robbing the two 7-11 stores and committing the murders and attempted murder of the taxi cab drivers.

During his statement, Petitioner talked about how he discussed with a friend who or what entity he could rob to get $3,000 to $5,000 "quick" so he could buy his girlfriend a Christmas present.  His only real issue with each robbery and murder was that he did not get much money from them and was far from obtaining the amount of money he thought he needed.

21

After the first two murders, Petitioner went to his girlfriend's house and told her what he had done. In his statement, he said he told her "I'm real scared . . . . I'm not scared that I shot them . . . . [I'm] scared because if I could do something like that to two people like that, that it would probably happen to, that I could probably do it again." Emphasis added. And, in just a few hours after this comment, Petitioner did try to "do it again" when he attempted to rob and shoot the third taxi cab driver.

During his crimes, it was Petitioner who was violent toward his victims.[19] Except for the third taxi cab driver who resisted

_____

[19] Petitioner talked about his girlfriend and how much he cared for her to the first taxi cab driver, Private (PVT) Christopher L. Fay. Petitioner was aware that PVT Fay was young and a soldier. Petitioner shot PVT Fay in the back of the head when he believed PVT Fay had not given Petitioner all of the money he had with him. Petitioner sat there looking at the hole in the back of PVT Fay's head and the blood "gushing out." He then cocked the gun again and shot PVT Fay again in the head and then he sat there observing "two holes in the back of [PVT Fay's] head." Petitioner returned to his barracks room to count his bounty. When Petitioner realized he didn't get much money, he thought about "nothing but . . . getting more money . . . Because if I could do something like that nothing matters too much" so he immediately went to call for a second taxi to rob. He called for PVT Fay's cab at about 8:00 p.m. He called for the second cab at about 8:15 p.m. When Petitioner got into the second cab with Bobby Sharbino, he engaged in a personal conversation. Petitioner talked about the military and became aware that Sharbino was in the military for twenty-one years and that he was wearing a hearing aid. Before shooting Sharbino in the head, Petitioner ordered him to lie down in the seat. Sharbino complied with the order and then Petitioner shot him in the head. Petitioner then returned to his girlfriend's house. Shortly thereafter, he accompanied her and some friends to a

22

and fought off Petitioner, all of the victims of Petitioner's
crimes were compliant and not aggressive towards Petitioner in
any respect.  Petitioner was on a one-man crime spree.  At the
time of his actions, as he indicated in his statement, he felt
he had nothing to lose by continuing to do what he was doing
until he got the money he wanted or thought he needed.
Fortunately, the spree came to an abrupt end when he failed to
murder the third taxi cab driver.

Like Wiggins, Petitioner did experience an excruciating
life growing up which included alcohol, drugs, sex, and
violence.  But unlike Wiggins, Petitioner had a history of

local club.  While at the club, Petitioner got into an
altercation with a man for looking at his girlfriend.  He drew
the gun and invited the man to go outside.  In the process,
Petitioner stumbled, dropped the weapon, which was cocked, and
it discharged.  Petitioner and his girlfriend departed the club
in a cab.  Petitioner dropped his girlfriend off to go to her
house but he stayed with the cab in order to commit another
robbery and murder.  During the robbery, Petitioner grabbed the
back of Howard D. Harrison's head and told him to open his
mouth.  As Petitioner was attempting to shove the barrel of the
gun into Harrison's mouth, Harrison grabbed the gun.  As the two
men tussled over the gun, it discharged.  Harrison tried to fire
the weapon at Petitioner but it would not fire.  Petitioner bit
Harrison on the hand while still struggling over the gun.
Harrison, while holding onto the gun, attempted to get out of
the cab and then, Petitioner bit Harrison on the head.  Harrison
tried to unsuccessfully fire the gun a second time.  When it did
not fire, Harrison let the weapon go and hit Petitioner.
Petitioner then began biting Harrison on the back.  Harrison
broke free and began to run but Petitioner pursued him.
Harrison stopped and then hit petitioner again.  Petitioner took
off in the direction of his girlfriend's house.  After
Petitioner departed the area, Harrison went back to the cab to
call the dispatcher to report the incident.

committing violent acts at a very young age.  If the defense had gone much further in presenting evidence of Petitioner's troubled childhood and psychological make-up, the Government would have had an opportunity to show the likelihood Petitioner would repeat his conduct.

Any additional mitigation evidence that might have been presented could not have outweighed the brutality and senseless nature of Petitioner's crimes.  Petitioner started acting out violently as a young boy and he continued that progression of violence until he reached the point of murdering one person, then murdering another person, and then, attempting to murder a third person over a period of a few hours on a single night. Evidence of Petitioner's background and violent life would have done nothing but confirm that Petitioner was the type of person who could perpetrate these malicious, merciless crimes.  Any more evidence of Petitioner's violent life would only confirm what Dr. Armitage and the defense counsel were trying to keep from the members -- Petitioner had a "classic 'sociopathic personality' and could very easily commit similar crimes in the future."  Loving, 41 M.J. at 250.  Appellate defense counsel have not presented any evidence that would create a reasonable probability that the members would have found against the death penalty had they heard any additional evidence.

V.   CONCLUSION

This Court should not manipulate the "law" and the facts of this case to achieve a particular end.  I agree that the facts of a case should be "salted down," but the facts that have already been "salted down" should not be ignored.  Here, the majority overlooks the facts in the original record of trial, the post-trial affidavits previously presented, and this Court's previous review of those same facts.  The issue of ineffective of assistance of counsel with regard to whether trial defense counsel conducted a reasonable investigation was thoroughly reviewed on direct appeal.  Regardless of whether this issue was addressed on direct appeal, I believe the facts necessary to conduct any further review are contained in the record as it currently exists and that this Court can make a determination of the reasonableness of trial defense counsel's investigation based on those facts.  I disagree that a DuBay hearing is necessary in this case.  Applying Strickland, or Strickland in "light of Wiggins," I would deny the petition for extraordinary relief based on the facts in this case.  Therefore, I respectfully dissent.